NUMBER 13-00-409-CR

 

                             COURT OF APPEALS

 

                   THIRTEENTH DISTRICT OF TEXAS

 

                                CORPUS CHRISTI

 

 



PATRICK TIMOTHY RICHARDSON,                                         Appellant,

 

                                                   v.

 

THE
STATE OF TEXAS,                                                          Appellee.

 



 

                        On appeal from the 292nd District Court

                                   of Dallas County, Texas.

 



 

                                   O P I N I O N

 

            Before Chief Justice Valdez and Justices
Dorsey and Hill[1]

                                     Opinion by Justice Hill

 








Patrick Thomas
Richardson appeals his conviction of the murder of his wife upon his plea of
guilty to a jury.  The jury, failing to
find that Richardson acted under the immediate influence of sudden passion
arising from an adequate cause, assessed his punishment at sixty years
confinement in the Texas Department of Criminal Justice, Institutional
Division, and a fine of $10,000. 
Richardson presents twelve issues in this appeal.  We affirm. 

SUDDEN PASSION
- FACTUAL SUFFICIENCY

Richardson
contends in issue one that the jury=s failure to
find that in killing his wife he acted under the immediate influence of sudden
passion arising from an adequate cause is so against the great weight and
preponderance of the evidence as to be manifestly unjust.  We will review all the evidence and set aside
the verdict only if it is so against the great weight and preponderance of the
evidence as to be clearly wrong and unjust. 
Dudley v. State, 992 S.W.2d 565, 567 (Tex. App.CTexarkana 1999,
no pet.); Naasz v. State, 974 S.W.2d 418, 423 (Tex. App.CDallas 1998,
pet. ref=d).  








Jason
Salisbury, a fire fighter and paramedic for the City of University Park,
testified that on September 19, 1999, he was dispatched to 4225 Colgate, where
he found the body of Richardson=s wife
Mary.  He indicated that Richardson was
kneeling over his wife when he walked in the study where Mary=s body was
located.  He related that Richardson made
no response when he asked him what was going on.  In Salisbury=s opinion, Richardson looked surprised
that Salisbury was there.  Salisbury stated
that Richardson=s suit was
covered with blood and that blood was dripping from his hands.  

Salisbury
testified that Richardson never replied to his question as to what was going
on.  He related that Richardson appeared
calm, not extremely disturbed or distraught. 
He indicated that Richardson was not crying, nor was he shaking and
trembling.  

Salisbury
indicated that he could not check the victim=s pulse because her neck was gone.  He described the wound as a slash that was so
deep that he could actually see a vertebra. 
Later he testified that in his opinion there was not just one slash to
the neck because the wound was pretty deep. 
He stated that he found scissors, within arm=s reach of
Richardson, near the body and covered with blood.  He also related that there was an extension
cord that went all the way up to the victim=s hair in the back of her head.  








Mike Shanley, a
family friend, testified that on the day of the murder he took his children to
the Richardson home at 12:30 p.m. so that they could attend a children=s play with the
Richardson children.  He indicated that
at the request of a police officer he took the Richardson children to his
home.  He stated that he overheard one of
the Richardson children say to his son that his daddy had jumped over the
couch, that his daddy did it.  He said that
when his wife responded that his daddy did not do it, the child stood up and
said that he did do it, that he had seen him do it.  He related that he also recalled a comment
about a wire and about scissors.  He
testified that he heard one of the Richardson children say that he had wanted
the scissors to cut the wire.  

Robert
Williams, the deceased=s brother,
testified about her and about their family and the relationships between Mary,
Richardson, and the rest of her family. 
As to Richardson, Williams said that Richardson had no personality.  He indicated that he did not interact with
anyone.  He verified that Mary had filed
for divorce on September 8.  He related
that if he had known that September 19 was the date that Richardson was
supposed to move out, he would have been there. 


Cathy Marr
testified that on the day of the murder she was working for the City of
University Park as a 911 operator.  She
identified the tape of the 911 call from the residence made while Richardson=s attack
against the deceased was in progress. 
Marr indicated that she could hear a commotion in the background, and
that she could hear someone saying, ANo, no,@ ANo, daddy,@ ADon=t hurt me,@ AGet off me,@ Help,@ and AHelp, get off
me.@  








Ann Ratelle
testified that she knew the deceased from the Episcopal School of Dallas.  She indicated that on the day of the murder
her husband saw Richardson at the 11:00 a.m. service at St. Michael=s.  She related that at about 1:15 or 1:20 her
husband woke her up to tell her about the murder, indicating to her that she
needed to go where the children were. 
She stated that at the Shanley residence she and others were playing with
the children.  She indicated that later
John Robert, one of the Richardson children, who had not said anything while
they were playing, came over to her and said, ADid you see my mommy=s face?@  Ratelle said that she replied that she did
not.  The child then said, AThere was blood
everywhere on her neck.  There was this
wire.  He cut her, he did it.  My daddy did it.@  When he said that, his sister Mary Beth said,
ANo, John
Robert, he was trying to help her.  It=s okay,
Boo-Boo.  Shh, Boo-Boo, it=s okay.@  According to Ratelle, John Robert just looked
at Mary Beth and said, ANo.@ 

Robert
Breckenridge testified that he came to the Richardson residence at about 1:30
p.m. the day of the murder in his capacity as a field agent for the Dallas
County medical examiner=s office.  He described the deceased=s wounds as one
of the most horrific throat wounds he had ever seen.  He indicated that he found an overturned lamp
with its cord tangled in the deceased=s hair.  He related that the cord was so tangled with
the deceased=s hair that it
was transported from the scene with her body. 
He noted an end table in the middle of a walkway that had blood extended
under it and had photo albums under it. 
He acknowledged that he did not know if the table was out of place, but
noted that most people don=t leave tables
in the middle of a walkway.  He also
referred to another table that was overturned and blocking the entrance to an
adjoining room.  He indicated that he saw
a Sunday bulletin from St. Michael=s Church.  Breckenridge noted that he found a pair of
scissors with blood and hair on it.  He
related that he found an earring and that one of the deceased=s ear lobes was
torn.  Based on the objects that he saw,
Breckenridge concluded that there had been a struggle in the room.  








Nathaniel
Williams testified that he had worked on and off for the deceased=s family since
she was sixteen years old.  He related
that on the day of the murder he went to the Richardson residence to take some
furniture from Kerrville that the deceased=s mother had
sent to her.  He indicated that when he
drove up, Richardson asked him where he was going with the furniture, then told
him not to bring any more furniture there. 


Williams
indicated that Richardson asked him if he knew that the deceased was divorcing
him.  He said that Richardson stated that
it had to do with more money.  According
to Williams, Richardson looked at the house and said, AAll of this
beautiful house and she=s not happy.@  Williams testified that he went ahead and
took in the furniture and stayed about thirty minutes.  Williams stated that Richardson said nothing
else to him while he was there, that Richardson was always a quiet man.  








 Dr. Jennie Duvall testified that she is a
medical examiner for Dallas County.  She
indicated that she performed the autopsy on the deceased on the Monday after
the murder.  She verified that the
deceased was received along with a table lamp and its lamp cord.  She stated that the deceased=s death was
ruled a homicide.  Dr. Duvall said that
the deceased suffered many injuries, with the major one being a deep incised
wound or cut of her neck.  She described
the wound as gaping, stretching across the front of her neck, then traveling
all the way to behind her right ear to just in front of her left ear.  The doctor said the wound measured about
seven and one-half inches along the surface of the neck, that it gaped open to
a maximum width of two and one-half inches and was extremely deep.  In Dr. Duvall=s opinion, at least four sawing motions,
and probably many more, were required with the scissors to inflict the wound to
the deceased=s neck.  

Dr. Duvall
testified that there were other cut wounds of minor significance to the
body.  Referring to the deep neck wound,
she indicated that the nature of the wound made it more consistent with
scissors than a sharp knife.  She also
noted that there were paired wounds to the collar bone and just below the
collar bone that would be consistent with scissors.  

Dr. Duvall
testified that she also found bruises on the deceased.  She said that these injuries were consistent
with manual strangulation, that some could be fingertips.  She also described a scrape to the left side
of the deceased=s jaw close to
the chin, another abrasion just above that, and several short linear
abrasions.  She indicated that those
wounds were consistent with strangulation, resulting from the deceased trying
to pull away while being choked.  She
also referred to short marks consistent with nail marks, either of Richardson
or the deceased.  She related that she
had seen both this type of injury and the skin abrasions in previous cases
involving strangulation.  Dr. Duvall
agreed that the deceased also had bruising in the oral mucosa under her
lip.  








Dr. Duvall
related that she found burst capillaries consistent with the restriction of
blood flow to the deceased=s head.  She indicated that the deceased=s bruises and
abrasions were more consistent with manual strangulation than strangulation by
ligature.  She acknowledged that
fingernail marks were consistent with both manual and ligature
strangulation.  She indicated that a
ligature is a rope, a cord, or whatever has been wrapped around the neck tight
enough to restrict the blood flow.  She
verified that the lamp cord that was entangled in the deceased=s hair could be
used as a ligature.  She acknowledged
that the findings related to the burst capillaries were also consistent with a
ligature strangulation.  She indicated
that the fact that only the back part of the deceased=s neck was
intact and the fact that she had a lot of hair could have resulted in the
absence of any mark by a ligature.  

Dr. Duvall
testified that the bruising on the oral mucosa around the deceased=s gum line was
a blunt force injury that could be caused by a blow to the mouth, falling and
striking some object, or a hand or object over the mouth.  She said that there was a pattern in the
deceased=s lungs
indicating that she had inhaled blood, and that there was some frothy bloody
fluid in her windpipe, both indicating that she was alive when her neck was
cut.  In Dr. Duvall=s opinion, the
deceased would have to have been strangled for some time prior to having her
neck cut.  She said this was also
indicated by the absence of high velocity blood spray from the cutting of the
neck.  








Dr. Duvall
described the extent of the cutting of the deceased=s neck in some
detail.  She indicated that the cut was
so deep that the spinal cord was visible. 
She related that not much of the deceased=s neck was left after the cutting, with
only an inch and a half of bone and soft tissue remaining to keep her head
attached.  Dr. Duvall also revealed that
there were some abrasions and bruises to the deceased=s forearms, to
her upper extremities, and a single bruise to her left thigh.  She related that the major bruise was on her
right forearm.  She described one bruise
on her arm that was consistent with the pattern on the lamp stand.  She concluded that the bruise was consistent
with being struck by the lamp or falling on it. 
She indicated that the location of the bruise was consistent with a
defensive injury.  

As a result of
the autopsy, Dr. Duvall concluded that the cause of the deceased=s death was
strangulation associated with the deep incised wound to her neck and the sharp
force injury to her neck.  She also
indicated that suffocation was consistent with that type of cause of
death.  She stated that the most probable
cause of death was the sharp force injury to the neck, an injury consistent
with having been done by scissors.  She
estimated that the time that it would take to inflict the sharp force wound was
anywhere from several seconds to two minutes. 
She said she thought it would have taken more effort than if a sharpened
knife had been used.  

Dr. Duvall
testified on cross-examination that a spontaneous domestic homicide is usually
spontaneous.  She also indicated that
crimes of passion are generally overkills with dozens and dozens of stab
wounds.  








Curtis
Ellenborg testified that he is a patrol officer for the City of University Park
who was dispatched to the scene, arriving about 12:18, shortly after Officer
Velasquez.  He said that when he first
saw Richardson he was emotionless, with Aa real stone
emotional look.@  He elaborated by saying that Richardson did
not appear upset or overly angry and was not crying.  He described in some detail how all of
Richardson=s clothing was
dripping wet with blood.  He said that
once Richardson was in a jail cell he did not pace around the cell, did not
cry, did not put his head in his hands, or appear traumatized.  According to Officer Ellenborg, Richardson
just sat on the bed in the cell, then laid down.  Officer Ellenborg acknowledged that another
report by someone else indicated that Richardson was shocked and
traumatized.  Officer Ellenborg insisted
that he was the one who had spent the most time with Richardson. 

John Donahue, a
criminalist for the Texas Department of Public Safety, testified that he
performed DNA testing on the blood on Richardson=s clothing and found that it belonged to
the victim.  He described hair found on
Richardson=s clothing as
being visually similar to the deceased=s hair.  He indicated that olive green fibers were
found under the deceased=s fingernails
and that Richardson was wearing an olive green suit.  He acknowledged that flesh and blood from
fingernail clippings of the deceased were her own.  








Patrick
Richardson, the seven-year-old son of Richardson and the deceased, testified
that his mother was on the floor with his father on top of her.  According to the child, she was asking
Richardson, AWhy are you
doing this to me?@  Patrick indicated that his father replied, AWhy are you
doing this to me?@  He indicated that his mother also said, AHelp@ and ACall 911.@  Patrick said his father cut her neck with
scissors that his father had grabbed from his hand.  He related that before he cut her neck he
stabbed her in the stomach.  Patrick
indicated that he had wanted his father to use the scissors to cut the black or
brown wire that was on his mother=s neck.  He indicated that he could not remember
telling a lady the next day after the murder that his father had not said
anything to his mother.  

Dr. Elissa P.
Benedek testified that she is a child, adult, adolescent, and forensic
psychiatrist.  She went into great
lengths as to her qualifications as a forensic psychiatrist, especially in the
area of children and domestic violence. 
She stated that she was a past president of the American Psychiatric
Association.  She also acknowledged being
a published author in the field of children and divorce.  Dr. Benedek said that the district attorney=s office had
contacted her regarding the case and that she was going to be paid $350 per
hour, with the understanding that her opinions might or might not be helpful to
the district attorney=s office.  

Dr. Benedek
testified that prior to interviewing the children, she had read police reports
and other materials, including statements by those who had talked to the  children previously.  She stated that in her opinion jealousy, and
jealousy with regard to money, was a portion of the reason why the murder
occurred.  She also indicated that in
view of the fact that there was a knock down, a strangling, and then a
stabbing, that the murder took place over a period of time.  Therefore, she concluded, it was not a single
impulsive act in the heat of passion.  








Dr. Benedek
acknowledged that she is not from Texas and is not familiar with Texas
law.  She further acknowledged that she
did not know the legal definition of sudden passion and was unfamiliar with the
legal definition of adequate cause.  She
expressed an opinion that at one time an assistant district attorney had
explained them to her.  Dr. Benedek also
acknowledged that she is not a criminologist, not a medical examiner, and not a
crime scene expert.  

Dr. Benedek
acknowledged on cross-examination that one source of her opinion as to the
cause of the murder was what Patrick told her. 
She indicated that Patrick had said, AI think he was mad.  Maybe he was jealous.@  She said Patrick told her that his father was
jealous of his mother because his grandfather had given his mother $2500 in
gold coins.  Dr. Benedek also
acknowledged that the interviews with the children did not disclose any prior
domestic violence.  








Dr. Benedek
noted that Patrick had stated during an interview, AWhen I was in
the room there was a wire on my mama=s neck.  I didn=t remember the
wire at first but Ga-Ga told me.@  She said that Mary Beth, another of the
children, told her, AMy mom was
arranging the furniture that Ga-Ga sent to us. 
I heard a crash, then I think maybe she dropped something, and then I
looked and saw my dad was on top of my mom.@ 
She related that the fact that the children might have stated that their
father stabbed their mother in the stomach, even though the medical examiner
did not indicate that she had been stabbed there, could have been caused by the
chaos of the situation with which they were confronted.  She said Patrick demonstrated the stabbing as
being agitated and wild.  She stated that
John Robert had indicated that his father had tackled his mother Aon the back.@  She said he used the word Atackled@ at least three
times.  Finally, having seen the legal
definition of adequate cause and sudden passion, Dr. Benedek restated her
conclusion that the crime was not the result of sudden passion. 

Kathy Wylie
testified that she was working in an American Airlines ticket office on
Wednesday, April 19, when Richardson came in using an assumed name and
exchanged a New York to London ticket, scheduled to depart on that date, for
another ticket leaving on April 21.  She
said she recognized Richardson immediately from seeing him on the news.  

Mike Bosillo
testified that he is a deputy chief investigator with the Dallas County
District Attorney=s Office.  After he had a discussion with Kathy Wylie
about  the information she had, he
contacted American Airlines and the police for the Port Authority of New York
to tell them of his suspicion that Richardson was planning on using fake
identification to fly from New York to London on April 21.  The port authority police staked out the
flight, but Richardson was not on it.  

Bosillo
revealed that Richardson was under electronic monitoring at the time, and he
arranged to be notified immediately if there were any breach of the monitor
security.  He said that the name
Richardson was planning to use to get to London was Robby Shane Wedeking of
Stamford, Texas, who he learned was the sheriff of Jones County.  According to Bosillo, after contacting
Wedeking, he discovered that the sheriff had farmed land owned by relatives of
Richardson.  Bosillo stated that Wedeking
was unaware that Richardson was using his name. 









Bosillo
testified that Richardson=s ticket
remained active after Richardson missed the flight.  Using the information about Richardson=s use of false
identification and his attempt to flee, Bosillo obtained a warrant to rearrest
Richardson.  After Richardson was
rearrested, Bosillo and others obtained and served a search warrant.  They searched a hotel room where Richardson
was living, his vehicle, and a storage shed. 
According to Bosillo, in Richardson=s room they
found the following: a sheet of notations regarding what appeared to be airline
flights; over $69,000 in $100 bills; a passport and Sam=s Club card
containing Wedeking=s name but
Richardson=s picture;
clothing, including swimming trunks; travel books on the Caribbean; a flight coupon
for the April 21 flight to London in the name of Wedeking; and identification
in the name of Harris with Richardson=s picture.  Many of these items, including the bulk of
the money, were packed in a travel bag. 
The Wedeking passport was not issued until April 21, the date that
Richardson was supposed to have been flying from New York to London.  








After the State
rested, Richardson called Officer Victor Velasquez as a witness.  Officer Velasquez testified that he is a
police officer for the City of University Park. 
He indicated that he arrived at the Richardson residence just after noon
on the occasion in question, entering the house just before the paramedics.  He related that when he first saw Richardson,
Richardson was standing over the deceased, holding his hands out with his palms
up and arms open.  He indicated that
Richardson was not crying or sobbing, did not put his face in his hands, and
was not shaking and trembling.  According
to Officer Velasquez, Richardson just appeared calm, with a blank stare on his
face.  On the other hand, Officer
Velasquez related that Richardson appeared shocked to see police officers walk
in and catch him over his wife=s body.    Officer
Velasquez testified that Richardson was slow in answering his questions,
appearing to be preoccupied.  He also
indicated that Richardson was reluctant and hesitant to answer his questions.  He related that after getting a drink of
water, Richardson just slowly walked around the kitchen island and stared into
the room where the deceased was.  Officer
Velasquez acknowledged that he had written in his report that Richardson
appeared shocked and traumatized.  He
insisted that Officer Ellenborg had spent the most time with Richardson at the
scene.

Lee Martinson
testified that he is president of ASAI, a metal distribution company based in
the Dallas area.  Martinson related that
Richardson was the controller for the company. 
He indicated that Richardson was kind and considerate in his dealings
with others in the business and that he was seemingly considerate with his
wife.  Martinson said that Richardson was
nonconfrontational, and that he had never known him to be a violent
person.  He stated that Richardson was a
person of ordinary temper.  








Martinson
testified that Richardson did not appear despondent when his mother was sick,
that it did not impact his work in any way, and that his work did not suffer
when his mother died.  Martinson indicated
that he was aware that Richardson=s wife had
filed for divorce and that Richardson did not want the divorce.  He acknowledged his awareness that Richardson
was upset because his wife was not continuing to work on the marriage.  He said Richardson had told him that he had
gone to counseling, but that his wife did not. 
Referring to the travel information that was found in the search, Martinson
could not state what it was about his relationship with Richardson that would
cause Richardson to have his work number, home number, and cell phone number
written down.  He acknowledged that no
one else had so many numbers next to his or her name.  Martinson denied knowing anything about any
flight.    

  Rob Walters, an attorney appearing because of
a subpoena, testified that he and his wife were friends of the Richardsons,
having met them through their children=s attendance at
the Episcopal School of Dallas.  He said
that his wife and the deceased were close friends, and that he had come to know
Richardson well through the Indian Guide program in which they and their sons
were involved.  He indicated that they
had been in Indian Guides together for a little over a year.  

Walters testified
that an Indian Guide event called Derby Day was held on Saturday, the day
before the murder.  He characterized the
event as one in which the fathers and sons were supposed to build little cars
together and race them.  He indicated
that Richardson was present that day. 
Walters stated that Richardson was a considerate person.  He described Richardson=s personality
as polite but impassive, docile, meek, maybe disengaged.  He said that Richardson was not an extrovert
and that he was not contentious.  He
indicated that temper, anger, or passion were not hallmarks of Richardson=s
personality.  








Describing the
deceased=s relationship
with her children, Walters testified that he did not know of another mother who
was more committed to her children than the deceased.  He said that he had learned a few days before
Derby Day of the pending Richardson divorce. 
Despite that knowledge, when he saw Richardson at the event, he just
casually asked him how he was doing.  He
indicated that Richardson answered that professionally he was doing fine, but
neither he nor Richardson discussed the divorce.  Walters said that there was a pregnant pause
and he recognized that personally things were not fine.  He stated that it was clear to him that the
divorce was weighing on Richardson=s mind.  At the time, Walters said, it seemed most
appropriate to move on to a different subject. 


Walters said
that he had socialized with the Richardsons a great deal and that, although the
deceased would occasionally have a glass of wine, any accusation that she had
any kind of alcohol problem was scurrilous. 
He characterized Mary as a person who ended up organizing everyone=s life.  He indicated that he did not observe her
criticizing, maligning, or disparaging Richardson.  

Walters
testified that Richardson was not loud or violent around his children, but that
he would not describe him as warm and affectionate with them.  He said that he was somewhat disengaged and
at times uninterested.  He indicated that
in Indian Guides Richardson was not highly involved in the life of his
son.  He stated that given the brutality
and senselessness of the murder, Richardson was not the kind of person that he
would think would be likely to do it.  








  Brian Book testified that he knew Richardson
through the Indian Princess program, a program for fathers and daughters.  He related that his daughter used to go to
school with Richardson=s daughter at
the Episcopal School of Dallas.  Based
upon his observations, Book stated that he thought Richardson=s relationship
with his daughter was very good.  He said
that as far as he knew Richardson attended all the outings of the Indian Princesses
and used it to spend time with his daughter. 
Book also related that Richardson sometimes assisted him in coaching
their children=s soccer
team.  

Book
acknowledged that he was not very familiar with the relationship between
Richardson and the deceased.  As to
Richardson himself, Book testified that he could not recall his ever being
angry.  He said that Richardson was not
the life of the party and Anot real
outgoing.@  He described Richardson as a quiet type and a
Avery
even-handed, mild-mannered type person.@  He stated that Richardson was friendly once
one got to know him.  Book acknowledged
that he was not a close friend of Richardson and that he did not know what he
was like in the privacy of his home.   








Bill Arnold
testified that he is an attorney and the husband of the deceased=s sister.  He said that he did not see the deceased much
at a wedding reception where she was supposed to have been drunk.  He said he had no idea whether she was cut
off from being served alcohol at the bar. 
As to her being with a man named Estes, he said he did not know anyone
named Estes and that he could not recall making any comment to Richardson
during the reception about the man. 
Arnold indicated that he vaguely remembered the deceased dancing at the
reception, but could not recall whether it was with Richardson or someone
else.  Arnold stated that Richardson told
him that when his wife passed out at home after she got sick from too much to
drink, he took photographs of her so that she could not deny it in the
future.  When asked if an intervention
was planned with respect to the deceased, he said that he would call it a
family meeting, not so much because of the night of the wedding reception but
to try to help the marriage.  He acknowledged
that he organized the intervention, but that it did not go through.  

Arnold
characterized Richardson as the quietest man he had ever met.  He related that he had tried to talk to him
many times, but did not know if he knew him 
at all.  He stated that he had
lunch and breakfast with Richardson many times, and that they were in a weekly
prayer group.  He indicated that at his
request the group prayed for a fictional couple named Bob and Patty that was
really Richardson and the deceased.  He
said that the group probably prayed that ABob@ would have
patience with APatty,@ that he would
love her with the love of Christ.  He
said that at a breakfast in March he told Richardson that he should love the
deceased as Christ would love her. 








Arnold could
not recall if he had told Richardson that the deceased was a woman out of
control, but indicated that he was concerned about her both because of the
wedding and other things that Richardson told him for which he had no
verification.  He acknowledged that he
may have said she was out of control. 
Arnold said he did remember the deceased taking the children out of town
on Father=s Day and
leaving Richardson by himself in Dallas. 
He said he did not know anything of Richardson hurting the deceased
physically or cursing or mistreating her. 


Arnold
indicated that the night of the wedding reception was the only time he had ever
seen the deceased have a drinking problem. 
He said that Richardson complained a lot to him about the deceased.  He related that the deceased, on the other
hand, did not feel comfortable talking to him about the marriage.  He stated that he did not know if what
Richardson was accused of was totally out of character.

Arnold
testified that the deceased was pretty strong willed and that Richardson had
told him that he could not control her. 
He related that his understanding was that Richardson could not make her
do what he wanted her to do.  Arnold said
that Richardson met with him about the problems with their marriage for two and
a half to three years before the murder.  


Arnold
testified that Richardson knew for several days ahead of time that he was
supposed to move out of the house on the day of the murder.  He said that Richardson had told him he did
not know whether he would move out on that date.  Arnold indicated that the divorce petition
did not request that Richardson move out and that he was not aware of any
restraining order to that effect.  He
related that as far as he knew there was no legal requirement that Richardson
get out of the house, but that he thought Richardson had told him that was the
day the deceased had asked him to move out. 









Lisa Kelly
testified that she is a credit manager for ASAI.  She indicated that  she worked with Lee Martinson, president of
the company.  She said that she was
familiar with Richardson because he was her boss for seven months.  She related that he was a good boss because
he was very supportive.  She also
indicated that he was very kind.  She
stated that her opinion, based on the care Richardson gave his children when
they were at a company bowling party, was that he seemed to be very involved
with his children and seemed to love them very much.  She acknowledged that she had only seen him
interact with his children on that one occasion.  Kelly described Richardson=s personality
as very passive and gentle and that he was easy to get along with.  She said that she never saw him display any
unusual temper or anger.   

Kelly
acknowledged that the death of his mother seemed to affect Richardson in that
he would come to the office, close his door, and become extremely
withdrawn.  She said he spoke of her in a
very loving manner during her illness prior to her death.  She indicated that she had no idea what
Richardson was like in the privacy of his own home.  








Priscilla Hunt,
Richardson=s older sister,
testified that Richardson was a good father and that his children enjoyed being
with him.  She related that he told them
stories they would later repeat.  She
said she usually had spent Christmas Day with her mother, but Richardson and
the deceased were never there on Christmas Day. 
She indicated that growing up she and Richardson would visit their
grandparents, and  her children had
visited her mother, but Richardson=s children
never did visit her.  She also recounted
an instance in which her mother wanted everyone to be present for a family
portrait, but the deceased and one of the children were not there.  Hunt stated that the deceased would visit her
mother-in-law the first couple of years she and Richardson were married, but
not thereafter.  

Hunt testified
that in March her mother=s health began
deteriorating from what was later discovered to be numerous brain tumors.  She related that when her mother was admitted
to Baylor Hospital in Dallas, Richardson visited her almost every day.  She indicated that once her mother was
actually admitted into the hospital the deceased never visited her.

Hunt testified
that her mother died in July, 1999.  She
said that Richardson and the deceased came to the funeral, graveside service,
and Acelebration of
life@ service.  She said that at the Acelebration of
life@ service those
who were at the funeral could talk about how her mother had affected people=s lives.  She said the deceased left the Acelebration of
life@ service early
and that Richardson had to leave early. 
According to Hunt, the deceased did not attend a later memorial service
and Acelebration of
life@ service held
in Abilene.  She indicated that
Richardson had expected her to be there.

Hunt testified
that both she and Richardson were devastated by their mother=s death and
overwhelmed because of the nature of their mother=s illness. 
She said that in talking to him after their mother=s estate sale,
which he attended, she felt that he was somewhat despondent.  She indicated that they had each picked out
personal items to keep.  She identified
an overturned table in State=s Exhibit 3 as
one that had come from their mother=s house.  On cross-examination, Hunt confirmed that
Robby Shane Wedeking had farmed land owned by her family.  








Hunt testified
that there was no violence in their family, that their parents got along pretty
well.  She said that their parents taught
them to work things out when there was a problem.  She agreed that violence in their home was
not an option, certainly not in response to someone saying something to hurt
one=s
feelings.  Hunt acknowledged that prior
to their mother=s illness she
had not seen Richardson very much.  She
said they relayed information through their mother.  Hunt also acknowledged that she did not know
that Richardson and the deceased had an unhappy marriage.  

Hunt testified
that when Richardson told her about the divorce he told her that he did not
want it and did not want to separate. 
She said he wanted to save his marriage. 
She indicated that he was very, very sad and very devastated and
depressed.  She related that practically
the day after the murder Richardson helped her find her hotel.  She said at that time he never asked about
the children or the deceased.  She said
he did not cry or sob, but was very withdrawn, almost like he was not mentally
present.  








Richardson, a
certified public accountant, testified that he pleaded guilty to the murder so
that his children would not have to testify. 
He said that prior to the murder he had a very good relationship with
his children, being very deeply involved in their lives.  He related that the deceased=s brother, who
was a friend from college, first introduced him to the deceased.  He indicated that they had a fifteen-month
courtship and a seven-month engagement. 
After discussing the accounting degree he received at the University of
Texas, Richardson recounted that he was president of the Dallas Texas Exes in
1996.  

Richardson
testified that he grew up in Houston, where he attended a Church of Christ
church at least three times per week.  He
said he loved his father and was very close to his deceased mother.  He stated that prior to her death he saw her
about six times per year.  He indicated
that during the marriage his family never spent Christmas with his mother
because it was important to the deceased to spend Christmas Day with her
family.  He described this as
awkward.  He said that his mother could
sense that she was imposing when she came to visit Dallas and, when she came,
the deceased would never take her anywhere or do anything for her.  He said the deceased did not have time for
her.  He related that their relationship
made him sad because he loved them both. 


Richardson also
testified about a family photograph that his mother had made in which the
deceased and one of their children had their photo cropped into the family
photo because they were not there due to the fact that the deceased was not interested
and chose not to go.  He described his
own family as one that was centered around the church, whereas the deceased=s family
typically gathered together on Sundays for family barbecues by the swimming
pool.  He also spoke of being excluded
from family business meetings that the deceased=s family had at Christmas.








          Richardson
testified that during the later years of his marriage the bad times began to
outweigh the good.  He indicated that he
went to marital counseling, wanting to improve the marriage.  He stated that, despite his efforts, the
deceased would not attend the counseling 


Richardson
testified that when they were first married, the deceased joined the Dallas
Junior League, a service organization, and stayed active throughout the
years.  He related that she spent a full
40 hours per week on Junior League activities, including work outside the home
three nights per week.  He said he stayed
home on those nights taking care of the children.  He related that she would leave for a 6:00 o=clock meeting
about the time he arrived home from work and that she would usually get home
about 10:30 or 11:00 p.m.  He indicated
that she had alcohol on her breath when she got home.  Later, he said, he found out that her
committee would have Apost-committee@ meetings at a
Mexican restaurant-bar. 

Richardson
testified that he began to be concerned about the deceased=s
drinking.  He said that at night when she
came in she would be angry at him if the children were not all asleep.  He also indicated that the deceased had six
good friends and that she went out for dinner and drinks with each one at least
once per month.  He  related that she was also involved with two ABunko@ groups that
involved a drinking game.  He said they
met once per month.  








Richardson also
described how the deceased got drunk at the wedding reception following her
younger brother=s wedding.  He told of her dancing with another man.  He said that although he was only ten feet
away she just ignored him.  He related
that after the dance, instead of coming to explain to him why she was dancing
with someone else, she went into a bar where she put her arms around other men
and started drinking tequila shots with them. 
He stated that she got very drunk and that the bartender cut her off
from further drinking.  Later, he
recalled, he saw the deceased with the man with whom she had been dancing.  He said that they each had an arm around the
other.  He indicated that when she leaned
over to whisper something to the man, he slid his hand down the back of her
neck to her butt, and she did not protest. 
He related that, with their daughter in the car, she threw up in his
truck on the way home, vomited on the street outside their house, vomited some
more in the bathroom, then passed out. 
Richardson said he took photographs of the vomit in the truck and of the
deceased passed out so that she could not deny later the condition she had been
in because she had denied such behavior in the past.  

Richardson
testified that Bill Arnold, the deceased=s
brother-in-law, initiated the idea of a family intervention to confront the
deceased about her drinking, but that it did not happen because the deceased
would not cooperate.  Richardson
indicated that he had suspicions that the deceased was having an affair.  He said he and the deceased stopped having
sexual relations in July 1998.  








Richardson
testified that if there were ever any reconciliation to a disagreement between
him and the deceased it was because he compromised.  He said that if they had an unresolved
disagreement she would punish him by taking the children away for the
weekend.  He related that she would call
from her cell phone late on Friday afternoons and tell him that she was en
route to her family=s ranch with
the kids and that she did not know when she would be back.  He said that on Father=s Day of 1999
she was with the children on a family trip with her family.  Richardson testified that whereas he wanted
to take the children to church on Sundays because that was what his family had
done and it was part of being a family, the deceased would come up with some
imaginative idea of something else to do.

Richardson
testified that he began a new job at ASAI in February 1999 that was challenging
and stressful.  He said that in April
1999 he was told of his mother=s disorienting
illness, which he later learned to be brain cancer.  He told of going to see his mother, who was
naked in the bathroom at the hospital and tearing things apart, and how he had
quieted her down.  He related that the
deceased resented his visiting his mother every evening at the hospital because
she was used to going out at night and leaving the children with him.  He indicated that the deceased never visited
his mother at the hospital.  He said that
when his mother died the deceased was at her family=s ranch in
Kerrville, where she stayed for a month. 









Richardson
testified that the deceased came to the funeral in Houston, but that he was not
able to stay at the Acelebration of
life@ afterwards for
as long as he wanted to because she had a plane to catch.  He said she indicated that she would bring
the children to the memorial service in Abilene, but did not show up nor call
to let him know she was not coming.  He
stated that he had wanted the children to be present so they would hear the
nice things that were said about his mother and her life.  Richardson also testified concerning how
difficult it was for him to be at his mother=s estate sale and see personal mementos
that he had seen around as a child disappear out the door.  

Richardson
testified that on Labor Day 1999 the deceased took the children out of town and
he was by himself.  He said that the next
day, when he was returning to work after coming home for lunch, the deceased
told him that she was miserable and wanted him Aout of here.@  He
indicated that on a previous occasion when she had used that term she had later
stated that she meant she wanted him to travel more.          According
to Richardson, the next day, when the deceased again told him she wanted him
out, she said she wanted a divorce.  He
said that the following Sunday she told him she wanted him out on Sunday,
September 19, the day of the murder. 
Richardson testified that he visited an attorney on Monday, September
13, who told him not to move until he told him to.  Richardson stated that he never agreed to
move out by September 19, emphasizing that he was not under any court order to
move out by that day.  Richardson stated
that he paid the attorney a retainer and was reconciled to the fact that there
was going to be a divorce. 








Richardson
recounted that at 11:00 o=clock on the
morning of the murder he went to St. Michael=s church because he always went to church
on Sundays.  He said that a great deal of
tension had developed between him and the deceased that week and going to
church was a nice escape to the calm, peaceful environment of the church with
hymns and prayers.  He remembered that he
brought home the church bulletin.  He
related that he walked home from the church, which was four houses away from
his home.  

Richardson
testified that as he approached the house, he saw on his front porch two tables
that had belonged to his mother, including one that he had just brought back
from the estate sale.  He described
himself as confused because he and the deceased had not discussed her moving
any items out of the house.  He related
that he brought both tables back inside the house.  He recalled that he put an oval table in the
library and set his church bulletin on it. 
He indicated that he went and sat down with his daughter to help her
with a new piano lesson she was practicing. 


Richardson
testified that the deceased walked into the room, looked displeased about the
table he had brought back in, and motioned him over.  According to Richardson, at that point the
deceased leaned forward on the table and said, AGet out and get your mother=s shit out, @ and then
turned the table over.  Richardson said
he was beside himself because seeing her turn over the table was like watching
her push his mother down the stairs.  He
indicated that he exploded into a rage. 
He stated that he had never felt such rage in his entire life.  He said that he grabbed the deceased, they
struggled, she slipped and fell down, and he fell on top of her.  








Richardson
testified that he remembered his daughter wanting to know what was going
on.  He said he was still in a rage like
he had never been in his life.  He stated
that he remembered his son holding the scissors.  He indicated that he thought he knocked the
scissors out of his son=s hand and that
he remembered the blood.  He recalled
that the next thing he remembered was the police coming, the paramedic asking
questions, and the police driving him to the police station.  He said that from having seen the facts and
evidence that he knew what he did and that he did it while two of his children
watched.  He insisted that he had not
planned to kill or hurt the deceased that day. 
He related that if he had wanted to kill her, there were guns and knives
he could have used.  He stated that he
could not remember what he told the police. 
Richardson testified that when he got to the police station he lay down
on the cot bed and faced the wall, but that he did not think he went to
sleep.   

Richardson
admitted having made the airplane reservations, saying that he was running from
the pain.  He said he did not know
whether he really would have fled. 
Richardson indicated that he regretted not having moved out at the
deceased=s request. 








Richardson
denied being jealous of the deceased due to her having a better relationship
with the children or due to her accomplishments.  He said that her dancing with one of her brother=s friends at
the wedding reception hurt him, but denied that it made him furious.  He denied wanting to hold the photographs of
the deceased passed out over her head to prevent her leaving in the future.  Richardson also denied whining about not
being with the children on Father=s Day two years
in a row.  He acknowledged going through
his wife=s daily planner
every day.  He recalled coming home for
lunch when he saw that she was having lunch with Sam, only to discover that Sam
was a five-year-old friend of his son. 
He admitted that he was still suspicious of her.  He acknowledged thinking about hiring a
private investigator, but that he never did. 
Richardson also admitted looking through the deceased=s
checkbook.  

Richardson said
he was not furious about the divorce when he talked to the deceased=s mother before
the murder, only concerned.  He
acknowledged that he asked her if she had Ablessed off@ on the
deceased=s
decision.  He remembered telling the
deceased=s sister that
he was concerned for the children and Athe stigma they
would have to grow up.@ [sic]  

When asked why,
if the fact that he was supposed to be moving out on the day of the murder was
not bothering him, he mentioned it to Nathaniel Williams as soon as he walked
in the door, Richardson said that he was stunned that his mother-in-law would
have sent new furniture knowing that he was moving out.  He said it was kind of like he was a piece of
furniture.  He said it was up to the jury
to decide if he were telling the truth about what happened that day.  He denied that his response to his wife, as
he was killing her, AWhy are you
doing this to me?,@ was related to
his moving out or to the divorce. 
Instead, he insisted, it related to her comment about his mother.  He denied jumping over a couch or tackling
the deceased.  He said that he did not
remember hitting the deceased in the mouth and was oblivious to choking her.  He indicated that he could not recall the
screaming that was on the 911 tape.  








Richardson said
that he did not remember getting the lamp and wrapping the cord around the
deceased=s neck and that
he did not remember how long it was that he strangled her with the cord.  He also denied remembering how he got the
lamp cord from around her neck.  He said
he did not know how he got his wife=s head severed
with the scissors, that he just remembered blood.  

When Richardson
was asked if he would have killed the children next if the police and
paramedics had not arrived, Richardson answered, AI mean, there=s certainly
more emotions between my wife and me than there were my children, and a lot more
emotions that had been accumulated over the years, emotions that had been
stored up and unexpressed.@ 

Richardson
testified in some detail about the careful planning he had made to escape to
Europe or the Caribbean.  When asked what
punishment he deserved for what he did, Richardson testified, AI deserve
whatever the jury decides.@  He repeated this answer when asked if he
deserved life.  Later, in response to the
same question, he said, AIt=s up to the
jury. I accept whatever they decide.@         













At the
punishment hearing of a murder trial, the defendant may raise the issue as to
whether he caused the death under the immediate influence of sudden passion
arising from an adequate cause.  Tex. Pen. Code Ann. '19.02 (d) (Vernon 1994).  If the
defendant proves the issue in the affirmative by a preponderance of the
evidence, the offense is a felony of the second degree.  Id. 
AAdequate cause@ means cause
that would commonly produce a degree of anger, rage, resentment, or terror in a
person of ordinary temper, sufficient to render the mind incapable of cool
reflection.  Tex. Pen. Code Ann. '19.02(a)(1) (Vernon
1994).  ASudden passion@ means passion
directly caused by and arising out of provocation by the individual killed or
another acting with the person killed which passion arises at the time of the
offense and is not solely the result of former provocation.  Tex.
Pen. Code Ann. '19.02(a)(2) (Vernon
1994).      We
hold that the jury=s verdict is
not so against the great weight and preponderance of the evidence as to be
clearly wrong and unjust.  In arguing
that the verdict is against the great weight and preponderance of the evidence,
Richardson refers us to the testimony about the divorce and the death of his
mother, as well as his own testimony about the comment the deceased made
concerning his mother.  The jury could
easily have determined from the evidence that Richardson was resentful about
his wife as a result of numerous things over the years, including the divorce
and his wife=s treatment of
his mother, and that any passion arising as a result of any or all of these
things was not sudden, but had been building up over time.  As to the comment that Richardson claims that
the deceased made about his mother, the jury could have reasonably concluded
that this was not an adequate cause.  We
also note that the jury was not required to accept Richardson=s version of
the facts.  Mixon v. State, 367
S.W.2d 678, 680 (Tex. Crim. App. 1963). 
That being the case, the jury could have determined that the deceased
made no such comment and that she did not turn over the table.  While there was evidence that the table had
been overturned, it was not necessary to conclude that it was the deceased who
overturned it or that it was overturned in the manner described by
Richardson.  Richardson asks us to
compare the facts in this case with those in Naasz v. State, 974 S.W.2d
418, 424-26 (Tex. App.CDallas 1998,
pet. ref=d).  We have done so and find that the opinion in
that case is consistent with and supports our opinion.  We overrule Richardson=s issue one. 

TESTIMONY
CONCERNING ULTIMATE ISSUE

Richardson
urges in issue two that the trial court erred in admitting into evidence the
psychiatrist=s opinion Athat did not
merely embrace the ultimate issue but decided it.@ 
Dr. Benedek was asked outside the presence of the jury what her opinion
was as to whether this offense resulted from sudden passion arising from an
adequate cause.  Richardson objected to
her answering the question, arguing that Rule 704 allows a witness to testify
as to certain opinions that embrace an ultimate issue, but does not allow a
witness to testify to the ultimate issue. 


When Dr. Benedek
was asked the same question before the jury, Richardson reurged his prior
objection based on Rule 704, referring to it as Aultimate issue decision opinion testimony
by this witness.@  Subsequently, when Dr. Benedek was asked the
question again after she had reviewed the legal definitions of the terms in the
question, Richardson objected on the basis of Rules 704, 705, and 702.  








On appeal,
Richardson argues that Dr. Benedek=s testimony did
not merely embrace the ultimate issue but decided it for the jury.  Rule 704 of the Texas Rules of Evidence
provides that testimony in the form of an opinion or inference otherwise
admissible is not inadmissible because it embraces an ultimate issue to be
decided by the trier of fact.  Tex. R. Evid. 704.  The question asked of Dr. Benedek embraced
the ultimate issue to be decided but did not answer the ultimate issue for the
jury.  If it is Richardson=s contention on
appeal that Dr. Benedek=s answer was
objectionable because she sought to decide the ultimate issue for the jury
rather than merely answering the question that embraced the ultimate issue, we
note that he made no objection to her answer on that basis.  

Richardson
relies upon Duckett v. State, 797 S.W.2d 906 (Tex. Crim. App.
1990).  In that case the court held that
while testimony merely embracing an issue is admissible under Rule 704,
allowing an expert to give an opinion as to whether a child molestation witness
was telling the truth or could be believed would cross the line of assisting
the trier of fact to replace that body as the decision maker.  Id. at 914.  The court did not suggest that asking a
question, such as the one in this case, that embraces an ultimate issue, or the
answering of such a question, is inadmissible because it replaces the trier of
fact as the decision maker.  We do not
find Duckett to be inconsistent with our opinion.  We overrule issue two.

HEARSAY - DR.
ELISSA P. BENEDEK








 Richardson insists in issue three that the
trial court erred by allowing Dr. Benedek to testify over a hearsay objection
that one of the reasons the murder occurred was because of jealousy and
jealousy with regard to money.  She
testified that her opinion was based in part on statements to her by one of the
children that his father was jealous of his mother, that his mother had more
money, about $2000 more.  Richardson
objected that Dr. Benedek=s opinion
testimony as to the cause of the murder constituted inadmissible hearsay.  Rule 703 of the Texas Rules of Evidence
provides that the facts or data in the particular case upon which an expert
bases an opinion or inference may be those perceived by, reviewed by, or made
known to the expert at or before the hearing, and that if of a type reasonably
relied upon by experts in the particular field in forming opinions or
inferences upon the subject, the facts or data need not be admissible in
evidence.  Consequently, if Dr. Benedek=s testimony was
objectionable, it would not have been that it was based upon hearsay, because
hearsay testimony may form the basis of an expert=s opinion. 
Rather, if it were objectionable it would have been that the facts or
data she relied upon were not of a type reasonably relied upon by experts in
the field in forming opinions or inferences upon the subject.  Richardson never made any objection on such a
basis, nor was any suggestion made that the facts or data Dr. Benedek was
relying upon were not of a type reasonably relied upon by experts in the field
in forming opinions or inferences upon the subject.  We find that nothing is preserved with
respect to this issue.  We overrule issue
three.








Richardson
argues in issue four that the trial court erred by allowing Dr. Benedek to
testify, over a hearsay objection, as to hearsay statements made by one of the
children who witnessed the incident. 
After defense counsel had questioned Dr. Benedek about her notes with
respect to one of the children, the prosecutor asked her whether, on the front
page of her statements, another of the children expressed to her  how his mother got on the floor.  She answered, AHe says my daddy tackled her.@  At that point Richardson objected on the
basis of hearsay, and the trial court overruled the objection.  The prosecutor then asked Dr. Benedek how the
child said she got on the floor. 
Richardson presented no objection to that question.  Dr. Benedek answered, AHe then said, >My daddy
tackled her.  I saw that he tackled her
on the back.=@  When the prosecutor asked Dr. Benedek how
many times the child mentioned the word Atackled@ on a single
page of her notes, it appears that counsel may have risen to object, because
the trial court said, AI=ve made my
ruling, Counselor.@  Dr. Benedek then replied, AAt least three
times.@  

We agree with
Richardson that his initial objection based upon hearsay should have been
sustained.  However, the same testimony
was received immediately thereafter without objection.  The trial court=s overruling of an objection to evidence
will generally not result in reversal when other such evidence is received
without objection.  Leday v. State,
983 S.W.2d 713, 716-17 (Tex. Crim. App. 1998). 
We overrule issue four.

HEARSAY -
ROBERT WILLIAMS








Richardson
submits in issue five that the trial court erred by allowing the deceased=s brother to
testify as to harmful hearsay statements made by the deceased against him.  Robert Williams, the deceased=s brother, was
asked whether the deceased told him, when they had lunch the Thursday before
the murder, how she was currently feeling. 
He replied, AYou could see
it in her face that she was under a lot of stress.@  Richardson made a hearsay objection; the
State argued that it was admissible under the Athen existing mental condition@ set out in the
rules of evidence.  The trial court
overruled the objection.  Williams then
continued his answer without further question, testifying that his sister=s main concern
was what Richardson would do to her and the kids after the divorce.  Richardson again presented a hearsay
objection that the trial court overruled.

Richardson
presented another hearsay objection when Williams was asked whether the
deceased had told him how she was feeling about Richardson.  The trial court overruled the objection.  During his answer to the question, Williams
testified that the deceased had told him Richardson was a monster.  Richardson posed no objection to Williams=s answer making
reference to the deceased=s statement
about his being a monster.

The prosecutor
then asked Williams if the deceased had told him how she was feeling or whether
she was feeling any concern or fear about Richardson.  After Williams had answered, AYes,@ Richardson
presented another hearsay objection that the trial court overruled.  Without there being another question,
Williams testified that the deceased had told him that Richardson was a very
manipulative, scheming person.  He
related that she felt like she was being followed and felt that Richardson
might be taping her calls.  Richardson
presented no objection to this testimony by Williams. 








When the
prosecutor asked Williams how the deceased felt about her personal belongings,
Richardson presented yet another hearsay objection that the trial court
overruled.  Williams answered that the
deceased was worried about Richardson going through her stuff at home.  Without objection, the prosecutor asked
Williams if he was referring to her Day-Timer calendar.  He replied, AHer Day-Timer, things like that.@  When Williams started to say, AHe had
confronted her --,@ the trial
court sustained Richardson=s objection
that the testimony was nonresponsive, while again overruling a hearsay
objection.       

We will first
consider the admission of Williams=s testimony
that his sister=s main concern
was what Richardson would do to her and the kids after the divorce.  The answer was in response to a question as
to how she was currently feeling on the Thursday before the murder.  The State suggests that this testimony was
admissible under the AThen Existing
Mental, Emotional, or Physical Condition@ exception to
the hearsay rule, an exception set forth in Rule 803(3) of the Texas Rules of
Evidence.  That rule provides that the
exception does not include, except under circumstances inapplicable here, a
statement of belief to prove the fact believed. 
In this instance the testimony showed the deceased=s belief that
Richardson was capable of harming the deceased or their children, and it was
offered to prove the truth of that belief. 
When the defendant=s statement
suggests an intent or future conduct by someone else, it goes beyond the state
of mind exception of Rule 803(3) and should not be admitted.  Wilks v. State, 983 S.W.2d 863 (Tex.
App.CCorpus Christi
1998, no pet.).  Consequently, the trial
court abused its discretion in overruling Richardson=s hearsay
objection to this testimony..








Despite the
holding in Wilks to which we have just referred, the State relies upon
it in arguing that the trial court did not abuse its discretion in overruling
Richardson=s
objection.  We find that the holding in Wilks
upon which the State relies is distinguishable.  In Wilks, Harold Wilks was convicted
of killing his wife Virginia after she refused to sign her consent to change
the beneficiary on his individual retirement account.  Id. at 865.  Upon refusing to sign, Virginia said, AWell, he=ll have to kill
me first, I=m not signing
it.@  Wilks objected to this testimony on the basis
of hearsay.  The court correctly held
that this statement did not relate to any intent on Harold=s part to kill
Virginia but to the strength of Virginia=s intention not
to sign the change of beneficiary form.  Id.  at 866. 
The court held that the trial court did not abuse its discretion in
admitting the statement because it showed her present state of mind as
authorized by Rule 803(3).  Id.  As we have already noted, in this case the
statement made by the deceased was not merely an expression of her state of
mind but was a statement of her belief that Richardson was capable of harming
her or their children.  








Admission of
hearsay evidence against a criminal defendant implicates the Confrontation
Clause of the Sixth Amendment of the United States Constitution because the
defendant is not afforded the opportunity to confront the out-of-court
declarant.  Guidry v. State, 9 S.W.3d
133, 149 (Tex. Crim. App. 1999).  That
being the case, our harmless error review is governed by Rule 44.2(a) of the
Texas Rules of Appellate Procedure.  Id.
at 151.  Given all of the evidence of
this case, including the fact that it is undisputed that Richardson brutally
murdered the deceased in front of their children, we hold beyond a reasonable
doubt that any error in admission of the deceased=s concern as to what Richardson might do
to her and the children did not contribute either to his conviction or his
punishment.      

We
next consider the admission of the deceased=s statement to Williams that Richardson
was a Amonster.@  Williams was asked whether the deceased had
told him how she was feeling about Richardson. 
As noted, the trial court overruled Richardson=s hearsay
objection.  The trial court did not abuse
its discretion in that ruling because the question did not necessarily call for
a hearsay response outside the exception outlined in Rule 803(3).  Richardson made no objection when Williams
answered the question by saying that the deceased had told him that Richardson
was a monster.  Consequently, no error is
preserved with respect to this testimony. 
Tex. R. App. P. 33.1(a)(1).









Richardson
refers to Williams=s testimony
that the deceased told him that Richardson was a very manipulative, scheming
person, that she thought she was  being
followed, and that she felt that Richardson might be taping her calls.  The prosecutor asked Williams if the deceased
had told him how she was feeling or whether she was feeling any concern or fear
about Richardson.  After Williams had
answered, AYes,@ Richardson
presented a hearsay objection.  If a
question calls for an objectionable response, a defendant should make an
objection before the witness responds.  Dinkins
v. State, 894 S.W.2d 330, 355 (Tex. Crim. App. 1995).  If the defendant fails to object until after
an objectionable question has been asked and answered, and he can show no
legitimate reason to justify the delay, his objection is untimely and error is
waived.  Id.  Inasmuch as Richardson did not object to
the question until after it had been answered and has failed to show any
legitimate reason to justify the delay, any error was waived.  When Williams testified that the deceased had
told him that Richardson was a very manipulative, scheming person, that she was
being followed, and that she felt Richardson might be taping her calls,
Richardson presented no objection.  We
hold that nothing is presented for review with respect to this testimony.  Tex.
R. App. P. 33.1(a)(1). 








 Finally, Richardson complains of Williams=s testimony
that the deceased told him that she was worried about Richardson going through
her stuff at home, including her Day-Timer calendar.  When the prosecutor asked Williams how the
deceased felt about her personal belongings, Richardson presented a hearsay
objection that the trial court overruled. 
The trial court did not abuse its discretion its discretion in
overruling Richardson=s objection
because the question did not necessarily call for objectionable testimony,
since the answer could have been admissible as an exception to the hearsay
rule, Rule 803(3).  Richardson made no
objection when Williams answered that the deceased was worried about Richardson
going through her stuff at home. 
Richardson made no objection when the prosecutor asked Williams if he
were referring to the deceased=s Day-Timer
calendar.  Williams answered, AHer Day-Timer,
things like that,@ then started
to say, AHe had
confronted her --@  At that point the trial court sustained
Richardson=s objection
that the testimony was nonresponsive and overruled yet another hearsay
objection.  The trial court did not abuse
its discretion in overruling the hearsay objection because it was
untimely.  We hold that nothing is
presented for review with respect to this testimony.  We overrule issue five.  

FLIGHT

Richardson
urges in issue six that the trial court erred in admitting into evidence the
extensive prejudicial testimony concerning his intended flight.  Richardson objected to flight testimony on
the basis that it was not relevant because he was pleading guilty and therefore
it would not go to establish his consciousness of guilt and on the basis that
its probative value was substantially outweighed by the danger of unfair
prejudice, confusion of the issues, or misleading the jury.  The trial court ruled that such evidence
would be admissible.  In view of
Richardson filing what is styled as an application for probation, his ability
to follow the law and respect the conditions of community supervision was at
issue.  We therefore hold that his efforts
to flee the country while on bond were highly relevant to the punishment issue
and that its admission did not result in any unfair prejudice to
Richardson.  We overrule issue six.

RECUSAL








Richardson
argues in issue seven that the trial court erred by denying his motion to
recuse.  He alleged that the trial judge
should be recused because his impartiality might reasonably be questioned or
because he had a personal bias or prejudice concerning the subject matter or a
party.  He alleged that the deceased and
the judge=s wife were
close friends, both belonging to the Dallas Junior League, and that the
deceased had been a strong supporter of the judge=s wife, herself a judge, in her last
election, and that the judge had declared his bond insufficient and raised it
from $30,000 to $1,000,000 without proper notice to him and without a hearing,
despite Richardson having made every required appearance.  Richardson must show that the trial court
abused its discretion by denying the motion.  Kemp v. State, 846 S.W.2d 289, 306 (Tex.
Crim. App. 1992).  We may not reverse a
trial court where the trial court=s ruling on the
motion was within the zone of reasonable disagreement.  Id. 
In making our abuse of discretion analysis, we consider the totality
of the evidence at the hearing on the motion. 
Id.  








The presiding
judge of the First Administrative Region presided at the motion to recuse.  Connie O=Neil, who
recently had been president of the Junior League of Dallas, a volunteer
organization of approximately 5600 members, testified that both the deceased
and the judge=s wife were
members of the League and members of its leadership council.  She indicated that the council, which
consisted of 40-42 members,  met seven or
eight times between June 1, 1998, to May 31, 1999.  While O=Neil could not
say how many of those meetings were attended by the deceased and Judge Kristin
Wade, the judge=s wife, she
testified that they worked together during those meetings on at least a few
occasions.  She characterized the
meetings, which would last from forty-five minutes to as long as an hour and a
half,  as more a presentation and agenda
than a gathering where everyone would visit with everyone else.  O=Neil related
that the deceased and Judge Kristin Wade did not serve on any other
committee.  The League president
described both the deceased and Judge Kristin Wade as active members of the
League.  O=Neil also testified that on December 6,
1998, both Judge Henry Wade, Jr., the trial judge, and his wife and Richardson
and the deceased had attended a party at her home.  O=Neil identified
several women as members or former members of the Junior League of Dallas. 

Judge Kristin
Wade testified that she had known the deceased through the Junior League of
Dallas, and that they both had served on the leadership council during the
prior club year.  She indicated that she
would classify the deceased as more of an acquaintance than a friend.  She said they knew each other by sight and
exchanged pleasantries when they saw each other.  She related that they did not engage in
personal conversation, but definitely engaged in Junior-League type conversation.  She stated that she did not know such
personal details as the number or names of the Richardson children.  She acknowledged having talked to the
deceased on occasions other than leadership council meetings and that their
relationship was a little more than someone meeting for the first couple of
times.  She testified that she and the
deceased attended most of the meetings of the leadership council.  She acknowledged that because of the group=s size it was
sometimes hard to keep track as to who was there.  Judge Kristin Wade testified that she
recalled the deceased having been at the December 1998 party at the home of
Connie O=Neil, and that
although she could not recall Richardson being there, he probably was and it
was likely that both she and her husband met him.








Judge Kristin
Wade testified that a member of the Junior League called her the evening of the
murder, telling her of the death and saying that she thought Richardson killed
her.  She related that at the time of the
call, her husband, Judge Henry Wade, Jr., asked who had called, but she was too
busy putting their children to bed to answer. 
She later told him that she had received a call from a friend informing
her that another girl she knew had been killed. 
When her husband asked if he knew the deceased, she told him her name,
but he again asked whether he knew her. 
Judge Kristin Wade indicated that she told him she did not know if he
did or not.  She stated that after seeing
pictures of the deceased on the evening news, her husband stated that he did
not recognize her.  She acknowledged that
she recognized the deceased.  Judge Kristin Wade testified she received
several phone calls the next day after Richardson was released on bond, all
from members of the Junior League.  She
related that the callers were unhappy, wanting to know how a bond works, how
bond is set.  She indicated that she
might also have received calls the following day.  She remembered that Connie O=Neill, the
immediate past president of the Junior League, had called her at some point
about the case.  She recalled a total of
about five or six calls.  She said it
would be a fair assessment that the callers were upset that Richardson was out
on bond.








Judge Kristin
Wade testified that on Monday, before getting the calls, while on their way to
work, she asked her husband what he thought about the bond and he thought that
the information on the news might have been incorrect in that it could have
been a cash bond instead of a surety bond. 
She denied that they discussed whether the bond amount was set too high
or too low.        

Judge Kristin
Wade testified that her husband had been in attendance with her at Junior
League functions to which spouses were invited. 
She indicated that there were only one or two such events per year.

Judge Kristin
Wade acknowledged that on Monday, the day after the murder, she contacted Judge
King, the judge who had set Richardson=s bond, and Ms.
Dyer, an assistant district attorney, concerning the bond.  She said both contacts were in the nature of
seeking information so that she could accurately answer the callers= questions and
know where to refer them.  She
acknowledged that she was trying to direct her friends who were upset about the
bond to Ms. Dyer so she could file a motion to raise the bond if she chose to
do so.  She insisted that Ms. Dyer had
already filed such a motion at the time she talked to her.  She again acknowledged that some of the
callers were outraged about the bond.  








Judge Kristin
Wade acknowledged that she attended the deceased=s funeral, which she indicated was
attended by a lot of people, including members of the Junior League.  She also indicated that the previous evening
she had told her husband of her plans to attend the funeral.  She related that she attended a reception
after the funeral at the headquarters of the Junior League.  She stated that the general consensus of those
with whom  she talked there was that they
were outraged that Richardson was out on bond. 
She recalled having spoken with O=Neil and two
others.  She subsequently testified that
she did not really know that there was much conversation about the bond at the
reception.  She affirmed the fact that
her husband knew from the news that there were some people outraged about the
amount of the bond.  She acknowledged
that her husband was aware that she had attended both the funeral and the
reception.  

Judge Kristin
Wade testified that she disagreed with the amount of the bond Judge King set,
but that she did not relate that to him. 
She indicated that she and her husband did not ride together to work on
the day the case was assigned to him. 
She related that she thought her husband already knew, before he was
assigned to the case, that the State had already filed a motion to raise the
bond.  

Judge Kristin
Wade acknowledged that several of those previously identified by O=Neil as being
affiliated with the Junior League had made contributions to her March 1998
primary election campaign.  She denied
that any of them were among those who had called her.  She said that she did not recall one of her
campaign signs having been in the Richardsons= yard, but that she would not be surprised
if one had been there. 

Judge Kristin
Wade insisted that after the case was assigned to her husband she called Junior
League headquarters and talked Ato Connie O=Neil and/or
Helen Holman,@ telling them
not to call her and not to have anyone else call her because she could not talk
about the case anymore.  She indicated
that she received no more angry phone calls after that.  








Judge Kristin
Wade insisted that she only knew the deceased through the Junior League; that
they had never been in each other=s homes; that
she had never had lunch with the deceased; and that she did not know the number
or names of the deceased=s
children.  She related that neighbors
also asked her about the bond because of all the publicity about it.  She said that she tried to distance herself
from her husband regarding the case.  She
said she had received campaign contributions from people who were not in the Junior
League, and that the deceased, to her knowledge, had not contributed to either
her or her husband=s
campaign.  She acknowledged that someone
could contribute to a campaign in non-monetary ways, such as having a yard sign
in their yard.  She said that she did not
think that she had ever discussed with her husband that their neighbors were
unhappy with the bond situation.  

Judge Henry
Wade, Jr., the trial judge, testified that he is the husband of Judge Kristin
Wade.  He indicated that on the night of
the murder he learned from his wife of the murder and that the deceased had
been a member of the Junior League.  He
said that he learned, before the case was assigned to him, that his wife had
received calls from someone in the Junior League who was unhappy about the bond
situation.  He related that he might have
met the Richardsons at the party at the home of O=Neil, but that he did not recall it.  He denied knowing any of the deceased=s family.  He said he was aware that his wife knew the
deceased through the Junior League, but was not aware that it was through the
leadership council.  








Judge Henry
Wade, Jr. testified that he was aware that his wife had attended both the
funeral and the reception and he that he recalled a conversation that occurred
before he took over the case  about
someone in the Junior League being unhappy about the bond.  He indicated that he was Akind of@ aware that it
was more than one person, although he was not aware of specific names.  He related that when Ms. Dyer presented him
with a motion to raise the bond prior to the case being assigned to him, as a
matter of courtesy he discussed the matter with Judge King as to what he should
do and they agreed he would do nothing. 
He acknowledged having seen press reports concerning public outrage
about the amount of the bond.  He said
that his wife let him know she disagreed with the amount of the bond.  He acknowledged that the morning the case was
assigned to him he granted a State=s motion to
declare Richardson=s bond
insufficient and raised it from $30,000 to $1,000,000,  in the absence of Richardson=s attorney and
without a hearing, although he knew Richardson was represented by counsel.  He related that it was represented to him
that a copy of the motion had been faxed to Richardson=s attorney.

          Judge
Henry Wade, Jr. testified that he only knew his wife=s Junior League
friends casually.  He said he did not
know the deceased, was not a friend of hers or of Richardson, and the fact that
the deceased and his wife had both been members of the Junior League would not
influence his decision in the case.  

In summary, the
undisputed evidence included the following:

1.
Judge Kristin Wade, wife of the trial judge, is a member of the Junior League
of Dallas.  








2.
Judge Kristin Wade served on the leadership council of the Junior League with
the deceased, a group that consisted of approximately 40-42 members, which had
met approximately 7-8 times. .

3.
After Richardson=s bond was set
at $30,000, several members of the Junior League called Judge Kristin
Wade.  In general, the callers were
outraged that Richardson was out on bond.

4.
At some point Judge Kristin Wade expressed to her husband, the trial judge, her
personal disapproval of the amount of Richardson=s bond.

5.
On the day after the murder, Judge Kristin Wade contacted the judge who set the
bond and an assistant district attorney involved in the case and discussed the
bond with them.

6.
Judge Kristin Wade attended the deceased=s funeral and a
reception following at the headquarters of the Junior League.  While at first Judge Kristin Wade testified
that the general consensus of those at the reception was outrage that
Richardson was out on bond, she later testified that, AI really don=t know that
there was much bond conversation at all at that particular reception.@  One of those to whom she spoke at the
reception was O=Neil, the
Junior League=s immediate
past president.

                   7.
Prior to the case having been assigned to him, Judge Henry Wade, Jr. knew of
the phone calls his wife had received from friends who were unhappy about the
situation relating to Richardson=s bond..   

8.
Judge Henry Wade, Jr. knew that his wife knew the deceased through the Junior
League and that she had attended both the funeral and the reception.








9.
The district attorney=s office
presented a motion to raise Richardson=s bond to Judge
Henry Wade, Jr. prior to the case having been assigned to him.

10.
The morning that the case was assigned to him, Judge Henry Wade, Jr. raised the
amount of Richardson=s bond from
$30,000 to $1,000,000 without a hearing and in the absence of Richardson=s counsel.  

One of the
bases for Richardson=s motion was
that Judge Henry Wade, Jr. should be recused because his impartiality might
reasonably be questioned.  The trial
court=s duty was to
determine whether the movant had provided facts sufficient to establish that a
reasonable member of the public at large, knowing all the facts involved in the
public domain concerning the judge=s conduct, would
have a reasonable doubt that the judge is actually impartial.  Sears v. Nueces County, 28 S.W.3d 611,
615 (Tex. App.CCorpus Christi
2000, no pet.).  

We hold that
when the totality of the evidence is considered, Richardson has produced
undisputed evidence that would show that a reasonable member of the public,
knowing all the circumstances involved, would have questions or doubts as to
the impartiality of the trial judge.  We therefore
hold that the trial court=s denial of
Richardson=s motion to
recuse is an abuse of discretion because it is outside the range of reasonable
disagreement.  








The State, in
urging that the trial court did not abuse its discretion by denying Richardson=s motion to
recuse, refers us to the testimony that we have already related, including
testimony from Judge Kristin Wade that she did not have a close relationship with
the deceased; that she had distanced herself from the case once it had been
assigned to her husband; Judge Henry Wade, Jr.=s testimony that he would not be
influenced by the fact the deceased and his wife were in the Junior League
together; and Judge Henry Wade, Jr.=s testimony
that he did not call a hearing on the State=s motion to raise the amount of Richardson=s bond because
he was not required to.  Assuming all of
this testimony to be true, the undisputed evidence still presents a factual
situation in which, if he or she knew all the circumstances, a reasonable
person would have questions or doubts about the judge=s
impartiality.  

The State also
argues that the trial court did not abuse its discretion because Richardson
failed to show any bias, prejudice, or partiality on the part of Judge Henry
Wade, Jr.  As we have previously noted,
Richardson did not have the burden to show bias, prejudice, or partiality on
the part of Judge Henry Wade, Jr. 
Rather, he was required to produce facts sufficient to establish that a
reasonable member of the public, knowing all the facts in the public domain
concerning the judge=s conduct,
would have a reasonable doubt that the judge is actually impartial.  The difference is well-described in some
detail in an article by Judge Charles Bleil and Carol King entitled AFocus on
Judicial Recusal: a Clearing Picture.@  Bleil, Charles and King, Carol, Focus on
Judicial Recusal: a Clearing Picture, 25 Tex.
Tech L. Rev. 773 (1994).  Our
opinion does not constitute a finding that there was any actual bias,
prejudice, or partiality on the part of Judge Henry Wade, Jr. 








The State
relies on Kemp, 846 S.W.2d at 306. 
We find that case to be distinguishable. 
In Kemp, the defendant sought to recuse the trial judge on the
basis that his failure to recuse would constitute a violation of the Texas Code
of Judicial Conduct and that the trial judge was constitutionally disqualified
due to bias because he had signed his initial search and arrest warrants.  Id. at 304-05.  On appeal, the court held that violation of
the Code of Judicial Conduct is not necessarily a ground for reversal and that,
in any event, the code provision relied upon by the appellant had been deleted.
 Id. at 305.  The court also held that the mere fact that
the trial judge had made a ruling at one stage of the proceeding does not make
the judge partial with respect to a later ruling in the case.  Id. 
at 306.  In the case at bar,
Richardson neither relies on the Texas Code of Judicial Conduct, nor does he
solely rely on the issue of bias on the part of the trial judge.  Rather, he asserts that, under these facts,
the trial judge=s impartiality
might reasonably be questioned.   








A case more
nearly on point is the recent case of Woodruff v. Wright, 51 S.W.3d 727,
738 (Tex. App.CTexarkana 2001,
pet. denied).  In that case the evidence
showed that the judge had performed a wedding ceremony for a party and the
party had performed heart surgery on the judge=s mother. 
Id. at 736-37.  The court,
in holding that the trial court did not abuse its discretion in denying a
motion to recuse, held that recusal is not required merely because the trial
judge is acquainted with a defendant, nor is it required where the party, who
was for some time the only heart surgeon in the region, had performed surgery
on a family member of the judge.  Id. at
737.  We hold that case to be
distinguishable as well because in the case at bar the record reflects more
evidence raising a reasonable doubt of the trial judge=s impartiality
than merely an acquaintanceship of the deceased with the judge=s wife.  We agree with the holding in Woodruff and
do not find it to be inconsistent with this opinion.        

Having found
that the trial court abused its discretion by denying Richardson=s motion to
recuse, we next consider whether the error affected Richardson=s substantial
rights, or, if the error be deemed constitutional, whether the error, beyond a
reasonable doubt, contributed to Richardson=s conviction or punishment.  Tex.
R. App. P. 44.2.  Considering the
totality of the record, including the fact that the jury assessed Richardson=s punishment;
the severity of the crime which he committed; and the lack of any showing that
the judge did anything during the punishment hearing indicating bias or
partiality, we hold that Richardson=s substantive
rights were not affected, and we further hold, beyond a reasonable doubt, that
any error in denying his motion to recuse did not contribute either to his
conviction or punishment.  Richardson
makes no argument that he was harmed and presents no authority with respect to
harm.  We overrule issue seven.

VOIR DIRE








Richardson
urges in issue eight that he was denied the effective assistance of counsel
when the trial court prohibited his attorney from asking the jury which jurors
would require an additional fact such as mercy killing before they could
consider assessing probation and subsequently not allowing his attorney to
identify those jurors who raised their hands before the trial court sustained
the State=s objection to
the question.  A prospective juror must
be able to consider the full range of punishment for the offense generally, not
for some specific manner or means of committing the offense.  Johnson v. State, 982 S.W.2d 403, 405
(Tex. Crim. App. 1998).  A hypothetical
question seeking to commit the jurors to a particular set of facts is an
improper question.  Atkins v. State,
951 S.W.2d 787, 789 (Tex. Crim. App. 1997). 
The question posed by defense counsel was not a proper question because
it sought to commit the jurors to a particular set of facts.  Consequently, the trial court did not err by
sustaining the State=s objection to
the question.  

Richardson
argues that his counsel was not attempting to commit the jurors to specific
facts in the case but attempting to determine whether they could follow the law
requiring them to be able to consider the full range of punishment.  We disagree. 
The jury was required to consider the full range of punishment generally
with respect to murder.  A Ano@ answer to
Richardson=s question,
however, would have committed the jury to consider probation in a non-mercy killing
case, which was something that they were not obligated to do.  We hold that the trial court did not err in
prohibiting this question because it sought to commit the jurors to specific
facts in the case.  We overrule issue
eight.

VICTIM IMPACT
TESTIMONY








Richardson
complains in issue nine that the trial court erred by admitting victim impact
testimony with respect to his children. 
Prior to testimony by Dr. Benedek, Richardson objected to victim impact
testimony on the basis that the deceased, not the children, was the only victim
insofar as victim impact testimony was concerned and  because its probative value was substantially
outweighed by the danger of unfair prejudice. 
After the trial court overruled Richardson=s objection, Dr. Benedek testified as to a
range of problems that the children might experience as a result of the trauma
surrounding their mother=s death and
predicted that they would suffer from the effects of witnessing the murder for
the rest of their lives.  Victim impact
testimony concerning the effect of the offense upon the victim=s family is
admissible.  Stavinoha v. State,
808 S.W.2d 76, 79 (Tex. Crim. App. 1991). 
Dr. Benedek=s testimony was
highly relevant to that issue and was not unfairly prejudicial.  We hold, therefore, that the probative value
of her testimony was not substantially outweighed by the danger of unfair
prejudice.  

Richardson
relies on the cases of Cantu v. State, 939 S.W.2d 627 (Tex. Crim. App.
1996) and Boston v. State, 965 S.W.2d 546 (Tex. App.CHouston [14th
Dist.] 1997, pet. ref=d).  In each of those cases the court held that
victim impact testimony with respect to extraneous offenses is
inadmissible.  Cantu, 939 S.W.2d
at 637; Boston, 965 S.W.2d at 551. 
Neither case held that victim impact testimony with respect to family members
of the victim named in the indictment for which the defendant was tried is
inadmissible.  We therefore find that
these cases are distinguishable and are not inconsistent with this opinion.  We overrule issue nine.

 








JURY MISCONDUCT  

Richardson
insists in issue ten that the trial court erred by overruling his motion for
new trial because he established that the jury had received Aother evidence@ during its
deliberations that constituted an Aoutside
influence@ and because
the jury engaged in jury misconduct resulting in the denial of a fair and
impartial trial.  In his motion for new
trial, Richardson urged that the jury received Aother evidence@ that
constituted an Aoutside
influence@ that was
brought to bear in that the jury considered the application of the parole laws
to his case, contrary to the jury instructions in the charge.  Richardson asserted in the motion that in an
affidavit attached to the motion a juror stated that the amount of time that
Richardson would be required to serve was discussed and that those figures were
put on a blackboard.  We have examined
the affidavit in question and find that, while the juror indicated that he
changed his mind from a lesser punishment to agree with the other jurors on a
sentence of sixty years, following a discussion concerning the parole laws and
the effects of the parole laws,  the
affidavit, although indicating that figures of terms of years and parole
eligibility were placed on a blackboard, contains no allegation that the amount
of time Richardson would be required to serve was discussed and that those
figures were put on a blackboard.  We
note, however, that the affidavit of one of Richardson=s attorneys
indicates that the juror related to him that the jurors discussed the parole
laws as well as the effect on the amount of time Richardson could be
incarcerated. 








Rule 606(b) of
the Texas Rules of evidence provides that upon an inquiry into the validity of
a jury=s verdict a
juror may not testify as to any matter or statement occurring during the jury=s deliberations
or to the effect of anything on any juror=s mind or
emotions or mental processes as influencing any juror=s assent to or
dissent from the jury=s verdict.  Tex.
R. Evid. 606(b).  The rule further
provides that a juror=s affidavit
concerning such matters would not be admitted into evidence for any of those
purposes.  Id.  The rule does provide that a juror may
testify as to whether any outside influence was improperly brought to bear upon
any juror.

A juror=s discussion
about the application of the parole law to the defendant=s  sentence does not constitute an outside
influence.  Hines v. State, 3
S.W.3d 618, 623 (Tex. App.BTexarkana 1999,
pet. ref=d).  Inasmuch as the testimony Richardson sought
to present in support of his motion was testimony concerning the jurors= deliberations
that did not constitute an outside influence, the trial court did not err in
overruling his motion for new trial.  We
overrule issue ten.                             








Richardson
insists in issues eleven and twelve that Rule 606(b) of the Texas Rules of
Evidence, as applied, constitutes a violation of his right to trial by jury as
mandated by article I, section 15, of the Texas Constitution and of his right
to a fair and impartial jury as provided by the Sixth Amendment of the United
States Constitution.  Rule 606(b) of the
Texas Rules of Evidence, as applied, does not constitute a violation of
Richardson=s right to
trial by jury as mandated by article I, section 15 of the Texas Constitution
nor of his right to a fair and impartial jury as provided by the Sixth
Amendment of the United States Constitution. 
Hines v. State, 3 S.W.3d at 622-23; Sanders v. State, 1
S.W.3d 885, 888 (Tex. App.CAustin 1999, no
pet.).  We overrule issues eleven and
twelve. 

The judgment is affirmed.             


 

____________________________

JOHN HILL

Retired Justice

 

 

Publish.

Tex. R. App. P. 47.3(b).

 

Opinion delivered and filed

this 1st day of August, 2002.

 











[1]Retired
Justice John Hill assigned to this Court by the Chief Justice of the Supreme
Court of Texas pursuant to Tex. Gov=t Code Ann. '
74.003 (Vernon 1998).