Pernell DUDLEY, Appellant,

v.

The STATE of Texas, Appellee.

No. 06–98–00117–CR.

Court of Appeals of Texas,
Texarkana.

Submitted April 5, 1999.

Decided April 6, 1999.

Charles Allen Brown, Attorney at Law, Houston, for appellant.

Charles C. Bailey, Titus County District Attorney, Mount Pleasant, for appellee.

Before CORNELIUS, C.J., GRANT and ROSS, JJ.

## OPINION

Opinion by Justice ROSS.

Pernell Dudley appeals from a judgment assessing punishment after a conviction for murder. In an earlier trial, a jury assessed his punishment at imprisonment for life. He appealed, and this Court reversed and remanded for a new punishment phase of the trial. Another jury assessed his punishment at imprisonment for ninety-nine years. It is from the judgment assessing this punishment that Dudley now appeals.

Dudley was convicted for the murder of Jeremy Hawkins which occurred at a party at the Youth Center in Pittsburg, Texas, in March 1996. About twenty to thirty minutes before the shooting, Dudley had been involved in a physical altercation with Franklin Batiste. Later, as Batiste left the Youth Center, Dudley fired at least nine rounds from a handgun in the direction of Batiste. Three of the rounds hit Batiste, causing him paralysis, and four rounds hit Jeremy Hawkins, a bystander, killing him.

In the first appeal,[1] we held that Dudley was entitled to a new punishment phase of the trial because there was some evidence raising the issue of sudden passion arising from an adequate cause[2] and that the

---

1. Cause Number 06–96–00145–CR.

2. Tex. Pen.Code Ann. § 19.02(d) (Vernon 1994) provides:

At the punishment stage of a trial, the defendant may raise the issue as to whether he caused the death under the immediate influence of sudden passion arising from an adequate cause. If the defendant proves

court committed reversible error in failing to submit this issue to the jury.

On remand, the court submitted the following question to a newly impaneled jury:

Do you the Jury find by a preponderance of the evidence that the defendant caused the death of Jeremy Hawkins under the immediate influence of sudden passion arising from an adequate cause?

The court instructed the jury that "preponderance of the evidence" means the greater weight of the credible evidence. The jury answered the question, "We Do Not."

Dudley contends that he proved the issue as to whether he caused the death under the immediate influence of sudden passion arising from an adequate cause by a preponderance of the evidence, as a matter of law. Therefore, he argues, the trial court erred in not restricting the jury to assessment of punishment for only a felony of the second degree. Dudley contends he should receive a new (third) punishment phase at which only second degree felony punishment is considered.

■ The Dallas Court of Appeals recently addressed this exact issue in *Naasz v. State*, 974 S.W.2d 418 (Tex.App.-Dallas 1998, pet. ref'd). A defendant invokes the factual review jurisdiction of an appellate court when he seeks review of a jury's failure to make a finding on which the defendant has the burden of proof, such as on an affirmative defense. *Naasz*, 974 S.W.2d at 420–21; *see also Meraz v. State*, 785 S.W.2d 146, 154–55 (Tex.Crim.App. 1990). The Dallas court noted that, "In such an instance, 'the correct standard of review is whether after considering all the evidence relevant to the issue at hand, the judgment is so against the great weight and preponderance of the evidence so as to be manifestly unjust.'" *Naasz*, 974 S.W.2d at 421 (quoting *Meraz*, 785 S.W.2d

at 155). The Dallas court further noted that the *Meraz* standard has been adopted as the standard of review generally for factual sufficiency challenges.[3] *Naasz*, 974 S.W.2d at 421. The Dallas court reasoned that, since the defendant has the same burden of proof under Section 19.02(d) of the Texas Penal Code as he does with an affirmative defense, i.e., by a preponderance of the evidence, then it is appropriate to use the *Meraz* standard (as followed by *Clewis v. State*, 922 S.W.2d 126 (Tex.Crim. App.1996)) to review a jury's rejection of the mitigating issue of sudden passion arising from an adequate cause. *Id.* In doing so, the Dallas court recognized that the Texas Court of Criminal Appeals had not extended factual sufficiency review to any punishment issue since its opinion in the *Clewis* case. *Id.* However, it noted that the Texas Court of Criminal Appeals has rejected factual sufficiency review for punishment issues only in capital cases because the issues are often subjective and call for prediction of future events rather than an assessment of events that have already occurred, e.g., future dangerousness. *Id.* The court pointed out that, on the other hand, the issue to be reviewed in the case before it-as it is in the instant case-is one requiring a determination, not of future events, but of historical fact, i.e., whether the defendant caused the death under the immediate influence of sudden passion. *Id.*

■ Generally, in reviewing the factual sufficiency of the evidence, all the evidence is viewed without the prism of "in the light most favorable to the prosecution," and the verdict is set aside only if it is "so contrary to the overwhelming weight of the evidence as to be clearly wrong and unjust." *Rojas v. State*, 986 S.W.2d 241, 247 (Tex.Crim.App.1998) (quoting *Clewis*, 922 S.W.2d at 129); *Naasz*, 974 S.W.2d at

the issue in the affirmative by a preponderance of the evidence, the offense is a felony of the second degree.

3. Citing *Cain v. State*, 958 S.W.2d 404, 407 (Tex.Crim.App.1997); *Clewis v. State*, 922 S.W.2d 126, 129 (Tex.Crim.App.1996); *Stone v. State*, 823 S.W.2d 375, 381 (Tex.App.-Austin 1992, pet. ref'd, untimely filed).

423; *Stone v. State,* 823 S.W.2d 375, 381 (Tex.App.-Austin 1992, pet. ref'd, untimely filed). "A clearly wrong and unjust verdict is 'manifestly unjust,' 'shocks the conscience,' or 'clearly demonstrates bias.'" *Rojas,* at 247; *Santellan v. State,* 939 S.W.2d 155, 165 (Tex.Crim.App.1997). It is assumed that the evidence is legally sufficient to support the conviction, and the appellate court then reviews the fact finder's weighing of the evidence and is authorized to disagree with the jury's determination. *Clewis,* 922 S.W.2d at 133; *Stone,* 823 S.W.2d at 381. The reviewing court must not substitute its judgment for that of the fact finder, i.e., the review must be appropriately deferential. *Clewis,* 922 S.W.2d at 133.[4] The reviewing court's evaluation should not substantially intrude upon the fact finder's role as the sole judge of the weight and credibility of witness testimony. *Naasz,* 974 S.W.2d at 423 (citing *Santellan,* 939 S.W.2d at 164). The weight to be given contradictory testimonial evidence is within the sole province of the jury because it turns on an evaluation of credibility and demeanor. *Naasz,* 974 S.W.2d at 423 (citing *Cain,* 958 S.W.2d at 408–09).

■ In the instant case, viewing the evidence without the prism of "in the light most favorable to the prosecution," it cannot be said that the jury's answer to the question submitted, i.e., that Dudley did not prove his mitigating defense by a preponderance of the evidence, is so against the great weight and preponderance of the evidence so as to be manifestly unjust. The testimony presented at the second punishment trial was in conflict regarding the alleged provocation of Dudley. The only witnesses who testified were Batiste, who testified for the State, and Dudley, who testified on his own behalf.

On direct, Batiste testified to an initial altercation with Dudley when Batiste first arrived at the Youth Center. Batiste said,

"When I was coming out [of] the hallway he [Dudley] like bumped into me with his shoulder and I turned around and pushed him back and that was it." This altercation lasted less than a minute and, "Well, they just grabbed both of us, he [Dudley] fell to the floor and they grabbed both of us and they put me back into inside [sic] the party and I guess he ran outside." Batiste testified that after the initial altercation, he did not see Dudley inside the building and that he stayed inside the building for about twenty to thirty minutes before he left. He said that when he was about five or six steps out the door, he realized someone was shooting at him; he heard one shot and then turned to see where it was coming from, and "I seen him [Dudley] hollering about, 'How do you like that' and started shooting." He said "a whole bunch of shots" were fired and that he had no idea Dudley was outside the building when he was leaving. He was hit by three bullets and paralyzed. He is now in a wheelchair.

On cross-examination, Batiste testified that at the initial altercation, after he was bumped by Dudley, he pushed Dudley to the ground. He said when Dudley got up, Dudley told him he (Dudley) "wasn't going out like a sucker, he wasn't going out like that." Batiste admitted that at this time he was probably cursing at Dudley. Batiste further testified that before the events of March 30, 1996, he and Dudley had been involved in another physical altercation in a pool hall in Mt. Pleasant which was broken up by the police. He also testified that before the events of March 30, 1996, he had received a one-year probation for deadly conduct concerning a gun, and he had a reckless conduct charge or conviction involving a gun. He said he did not have a habit of carrying a weapon, and he did not believe he was known in the community as being a person who carried a weapon.

*State,* 970 S.W.2d 111 (Tex.App.-Dallas 1998, no pet.).

---

4. For a recent court of appeals case applying the *Clewis* standard of factual sufficiency review to an affirmative defense, see *Reaves v.*

On redirect, Batiste testified that, before the shooting on this occasion, no weapon had ever been used, displayed, or to his knowledge, even possessed at his previous encounters with Dudley. On recross, Batiste testified that he had known Dudley for about five to six years and that before the events of March 30, 1996, he was aware that Dudley had physical limitations.

Dudley testified on direct that his physical limitations were due to gunshot wounds he suffered in 1991. He said Batiste, not he, started the physical altercation that occurred about thirty minutes before the shooting. He said that he was standing in the corner of the entryway to the Youth Center talking to some people when Batiste walked by, noticed him, and said, "What's up, what do you want to do?" Dudley replied, "I don't want to do nothing." He said Batiste acted as if he was going to walk out the door and then turned around and hit him in the face. It knocked him to the floor and he was dazed, but it was not necessary to forcibly separate them, and some guys helped him off the floor. He said that after the physical altercation, he went to his car for a few minutes but decided not to let this incident ruin his night. He then went to a place outside the entrance to the Youth Center and stood around talking to people. As he was standing there looking out at the parking lot, a couple of ladies came walking out of the Center, and somebody called his name from the door area and said a couple of curse words. He turned around to see who called his name, and he saw Batiste with James Lampkin beside him, and with Shawn Walton and his brother, Terence, standing in front of the door. They were all standing looking at him, and then Batiste said, "There that mother fucker is." Dudley asked, "Are you talking to me, who are you talking about?" Batiste said, "You, mother fucker," and then they all started coming toward him. Dudley said he could not believe that Batiste was coming after him because Batiste knew that he had physical limitations and that he could not fight. He said he was in fear of imminent bodily injury or death when these four guys came after him, and, "The next thing I remember is a session [sic] of pops then when he got to me when I started backing trying to keep them off me and I heard this succession of pops. I knew I had to get out of there, when I got out I realized that I had my gun in my hand, I knew I had shot, I knew I had shot." He said that even after he fired the first shot, they continued to come at him.

On cross-examination, Dudley admitted he had the gun the entire time he was outside the car. He also admitted that during the earlier altercation, Batiste had not used a gun. He could not remember, however, actually shooting his own gun.

The jury's answer to the question submitted is not so contrary to the overwhelming weight of the evidence as to be clearly wrong and unjust, i.e., it is not manifestly unjust, nor does it shock the conscience or clearly demonstrate bias. Given the conflicting testimony involved and that the jury is the sole judge of the weight and credibility of the evidence, there is plenty of room to disbelieve Dudley's version of the facts and to believe Batiste's version. The jury could have believed that after the physical altercation with Batiste, Dudley had sufficient time to cool off before the later shooting. Also, it could have found that Batiste did nothing to provoke the shooting as he was leaving the Youth Center. The evidence is sufficient to support the jury's verdict.

We overrule Dudley's point of error and affirm the judgment.