COURT OF APPEALS
EIGHTH DISTRICT OF TEXAS
EL PASO, TEXAS



| | | |
|---|---|---|
| LONNIE BILL BURCHAM, | § | No. 08-22-00196-CR |
| Appellant, | § | Appeal from the |
| v. | § | 385th Judicial District Court |
| THE STATE OF TEXAS, | § | of Midland County, Texas |
| Appellee. | § | (TC# CR55841) |

## MEMORANDUM OPINION

Appellant Lonnie Bill Burcham pleaded guilty to one count of murder and one count of aggravated assault with a deadly weapon. Following a trial on punishment, the jury assessed punishment of 80 years' imprisonment for Appellant's murder conviction and 15 years' imprisonment for his aggravated-assault conviction. Appellant challenges his punishments in one issue, arguing that the evidence is legally and factually insufficient to have allowed the jury to reject his claim that he acted under the influence of sudden passion when he committed the offenses. For the following reasons, we affirm Appellant's punishment for both of his convictions.[1]

---

[1] This case was transferred from our sister court in Eastland, and we decide it in accordance with the precedent of that court to the extent required by TEX. R. APP. P. 41.3.

## I. FACTUAL AND PROCEDURAL BACKGROUND

### A. Factual background

#### (1) *Pre-offense events*

In 2011, Appellant began a romantic relationship with Brandy Snider. Later that year, the couple moved into a house in Midland, Texas, along with Brandy's children, Makenzie and Cody. Appellant and Brandy were informally married in 2016. Makenzie testified that Appellant would often get angry at Brandy during the relationship and recalled several incidents in which Appellant physically pushed Brandy and Makenzie. Makenzie also recalled that Appellant and Brandy engaged in frequent verbal fights prior to the end of their relationship. On September 1, 2020, Brandy met John Davis through "Tinder," a dating app. Brandy and Davis began sending sexually themed text messages to each other.

On September 5, 2020, Makenzie overheard Appellant and Brandy arguing at their house. Cody became involved in the argument, then Appellant pushed Brandy and Makenzie and Cody began striking Appellant, knocking him down. Police Officer Xzavier Martinez arrived at the house and arrested Appellant for the incident. After this incident, Appellant and Brandy ended their relationship, Appellant moved out of the house, and Brandy changed the locks on the doors to the house. Nevertheless, Brandy continued send text messages to Appellant on an almost-daily basis for the next several weeks, including texts of a romantic or sexual nature. After Appellant moved out, Makenzie saw Appellant driving down the street and "watching" the house on several occasions. Meanwhile, Brandy and Davis met each other in person on September 25, 2020, and they continued communicating with each other daily. On September 28, 2020, Brandy was involved in a car accident, received treatment at a hospital, and was discharged and sent home.

2

## (2) *The shooting*

On September 29, 2020, Brandy invited Davis over to her house for dinner. Davis arrived at the house at approximately 5:00 or 6:00 p.m. and spent time watching television in Brandy's bedroom with Brandy and Makenzie after dinner. Cody was also present at the house that night. Davis testified that on the night in question, he and Brandy consumed alcohol together at Brandy's house and he eventually fell asleep on Brandy's bed.

According to Appellant's cell phone records, Appellant sent a message to Brandy's cell phone at 6:38 p.m. asking "Who you got over there?" to which Brandy replied "Patrick's dad and helper looking at house." Several hours later, Appellant asked if the man was still there and told Brandy he was going to come over to pick up some of his belongings. Appellant repeatedly expressed suspicion about the man's presence at the house, and Appellant's last message, sent at 1:53 a.m. on September 30, read "Why is he still there[?]"

Later that night, Davis woke up in Brandy's bed to Appellant and Brandy arguing in a "[c]alm" manner with "no yelling or screaming." Davis saw that Appellant had a handgun in his hand. Davis told Appellant he could not be at the house and needed to leave, and Appellant stated, "I'm done. I'm tired of this shit. I'm not doing this anymore." Brandy asked, "Why do you have a gun?" and Appellant responded, "Because I'm going to stop this stuff tonight." Appellant also stated, "Nobody leaves this house tonight . . . . First, I'm going to kill this old boy right here," and he pointed the handgun at Davis. Appellant then explained that Brandy was going to watch Davis die, then Appellant was going to shoot Brandy's children, then he would then kill Brandy, and finally he was "going to take care of [himself]" after the police arrived. Davis recalled that Appellant was "calm [and] collected . . . [and] wasn't enraged" when he made these statements. Appellant told Davis that Brandy "does this all the time" (i.e., have extramarital affairs), and

3

Brandy denied the accusation. Davis started to get up and attempted to leave, but Appellant pointed the handgun at his face and told him to get back on the bed.

After Appellant and Brandy eventually left the room, Davis called 911 but was unable to speak to the dispatcher. Appellant, Brandy, and Davis ended up in the area between the kitchen and living room, and Appellant ordered them to go back into the bedroom. Makenzie walked into the bedroom and told Appellant that he was not supposed to be in the house, and Appellant told her to leave. Makenzie left after Brandy and Davis begged her to do so, and Mackenzie and Cody both called 911. Davis's cell phone began ringing, and Appellant took the phone and put it in his pocket. Eventually, the argument between Appellant and Brandy became louder, and Appellant told Davis that "[t]he cops are going to find you the way I found you" and that he was going to take a picture of Davis with his phone, presumably after Appellant killed Davis and Brandy.

After Appellant had spoken to Brandy and Davis for approximately 25 to 45 minutes, Appellant looked out the window and saw that police officers had arrived and were beginning to surround the house. When officers knocked on the front door and announced their presence, Appellant said, "It's time," raised his handgun, and began shooting. Davis ran from the bedroom but was hit in the back by one round and fell to the floor in the hallway in front of several Midland Police Department officers who had arrived on scene.

One of the officers was Xzavier Martinez, who had previously been dispatched to Brandy's house and had arrested Appellant for the September 5 incident. At 2:12 a.m. on the night of the shooting, Martinez was dispatched to Brandy's house in reference to a disturbance with weapons and recognized Appellant's vehicle as he pulled up to the house. Martinez heard several gunshots, immediately ran to the front door, and saw Davis crawling on the floor with a gunshot wound to his back. Martinez and other officers walked into the bedroom and found Brandy and Appellant

4

laying on the floor. Appellant had a self-inflicted gunshot wound to his head and Martinez initially thought he was dead. A handgun was laying on the floor next to Appellant. Brandy suffered a gunshot wound to her chest and died at the scene. Appellant was treated at a hospital and arrested. Appellant's medical records showed he had an elevated level of ethanol in his blood and was diagnosed with alcohol intoxication. Brandy's autopsy revealed that she died from a gunshot wound to her chest, and a medical examiner who examined the autopsy report opined that her manner of death was homicide.

### (3) *Other evidence*

Michael Traughber, Appellant's friend, testified that he consumed alcohol with Appellant on the night of the shooting. Traughber noticed that Appellant had access to the Ring door camera at Brandy's house through his cell phone, and Appellant mentioned seeing a man at Brandy's house on the camera that night. According to Traughber, Appellant seemed to be "normal" and was playing with Traughber's children before he left Traughber's house to go back to his motel room. Traughber also testified that Appellant's prior wife had cheated on him and that despite the fact Brandy would flirt with other men in Appellant's presence and had engaged in "multiple infidelities" over the years, Appellant was determined that he "was not going to lose" his relationship with Brandy.

Sandra Fowler, Appellant's sister, testified in Appellant's case-in-chief that she did not see Appellant and Brandy getting into fights during their relationship. Fowler also testified that she had a phone conversation with Appellant the day before the murder wherein Appellant expressed his suspicion about a truck parked outside Brandy's house. Esther Burcham, Appellant's mother, also testified that Appellant "adored" Brandy and that when she (Esther) spoke to Appellant the day before the murder, she had no indication anything was wrong or the shooting would occur.

5

### B. Procedural history

The State of Texas initially charged Appellant with one count of capital murder of Brandy. The State later amended the indictment to charge Appellant with one count of capital murder of Brandy (Count I), one count of attempted capital murder of Mackenzie or Davis (Count II), one count of murder of Brandy (Count III), one count of aggravated assault with a deadly weapon against Davis (Count IV), and one count of aggravated kidnapping of Davis (Count V). The State and Appellant entered a plea agreement in which Appellant would plead guilty to Counts III and IV and the State would dismiss Counts I, II, and V. Appellant entered a written judicial confession admitting his guilt to Counts III and IV and his written waiver of appeal of the guilt-innocence portion of trial. Both parties waived a jury trial on guilt-innocence. Appellant entered an open plea in the trial court with a jury to determine his punishment.

After the trial court accepted Appellant's guilty pleas on Counts III and IV, the case was tried to a jury on punishment. Appellant raised the issue of sudden passion, and the trial court charged the jury on the same. The jury found against Appellant on the sudden-passion issue and assessed punishment of 80 years' imprisonment on Count III and 15 years' imprisonment on Count IV. The State dismissed Counts I, II, and V. The trial court certified Appellant's right to appeal the punishment phase of trial. Appellant filed a motion for new trial on punishment that appears to have been overruled by operation of law. This appeal followed.

## II. DISCUSSION

In his sole issue on appeal, Appellant challenges his punishment for Counts III and IV, arguing the evidence was legally and factually insufficient to support the jury's rejection of his sudden-passion claim.

### A. Standard of review

For elements of a criminal offense where the State has the burden of proof beyond a reasonable doubt, we review sufficiency of the evidence under the *Jackson v. Virginia* standard. *See Jackson v. Virginia*, 443 U.S. 307, 315–16 (1979); *Brooks v. State*, 323 S.W.3d 893, 912 (Tex. Crim. App. 2010). However, for matters in which the defendant bears the burden of proof by a preponderance of the evidence—such as the sudden-passion claim Appellant raised at punishment—we employ the civil standards of review for legal and factual sufficiency of the evidence. *See Rankin v. State*, 617 S.W.3d 169, 184–85 (Tex. App.—Houston [1st Dist.] 2020, pet. ref'd); *Gonzales v. State*, No. 11-17-00245-CR, 2019 WL 3727509, at *1-2 (Tex. App.— Eastland Aug. 8, 2019, pet. ref'd) (mem. op., not designated for publication); *see also Matlock v. State*, 392 S.W.3d 662, 671 (Tex. Crim. App. 2013) (recognizing that a factual-sufficiency review applies to issues where the burden of proof is by a preponderance of the evidence because that standard is the same used in various civil proceedings).

As applied to a sudden-passion claim, we review the evidence for legal sufficiency by examining the record for any evidence that supports the jury's finding while ignoring all evidence to the contrary unless a factfinder could not. *Matlock*, 392 S.W.3d at 669; *Rankin*, 617 S.W.3d at 185. If no evidence supports the jury's finding, we review the entire record to determine whether the evidence establishes the opposite as a matter of law. *Matlock*, 392 S.W.3d at 669; *Rankin*, 617 S.W.3d at 185.

We review the evidence for factual sufficiency to support the jury's finding by examining all of the evidence in a neutral light to determine whether the verdict is "so against the great weight and preponderance of that evidence to be manifestly unjust." *See Matlock*, 392 S.W.3d at 671 (citation and internal quotation marks omitted); *Rankin*, 617 S.W.3d at 185–86; *see also Meraz v.*

7

*State*, 785 S.W.2d 146, 154–55 (Tex. Crim. App. 1990) (en banc) (setting forth this standard). We may only sustain a factual-sufficiency challenge "if, after setting out the relevant evidence and explaining precisely how the contrary evidence greatly outweighs the evidence supporting the verdict, the court clearly states why the verdict is so much against the great weight of the evidence as to be manifestly unjust, conscience-shocking, or clearly biased." *See Matlock*, 392 S.W.3d at 671.

In reviewing both legal and factual sufficiency of the evidence, we must defer to the jury's role as sole judge of the weight and credibility of the evidence and recognize that the jury is free to accept or reject a defendant's version of the events supporting his sudden-passion claim. *See Rankin*, 617 S.W.3d at 185; *Gonzales*, 2019 WL 3727509, at *2.

### B. Applicable law

Murder is normally a felony offense of the first degree. TEX. PENAL CODE ANN. § 19.02(c). However, § 19.02(d) of the Texas Penal Code allows a defendant to raise the issue of sudden passion in the punishment phase of a trial for murder. *See id.* § 19.02(d). In particular, § 19.02(d) provides:

> At the punishment stage of a trial, the defendant may raise the issue as to whether he caused the death under the immediate influence of sudden passion arising from an adequate cause. If the defendant proves the issue in the affirmative by a preponderance of the evidence, the offense is a felony of the second degree.

*Id*. "Adequate cause" means a "cause that would commonly produce a degree of anger, rage, resentment, or terror in a person of ordinary temper, sufficient to render the mind incapable of cool reflection." *Id.* § 19.02(a)(1). "Sudden passion" means "passion directly caused by and arising out of provocation by the individual killed or another acting with the person killed which passion arises at the time of the offense and is not solely the result of former provocation." *Id.* § 19.02(a)(2). The

8

defendant has the burden of production and persuasion to prove sudden passion. *Wooten v. State*, 400 S.W.3d 601, 605 (Tex. Crim. App. 2013).

## C. The evidence is legally sufficient to support the jury's negative sudden-passion finding

We first review the evidence supporting the jury's rejection of Appellant's sudden-passion claim. *See Gonzales*, 2019 WL 3727509, at *1. At trial, the State established that Appellant and Brandy had a strained relationship at various times, and Appellant had been arrested for assaulting Brandy and Makenzie on September 5, 2020, less than a month before the shooting. Nevertheless, cell-phone records showed that after Appellant was arrested for the September 5 incident, Appellant and Brandy continued to plan dates with each other and communicate in a sexual and often contentious manner.

Traughber testified that on the night of the shooting, Appellant used his cell phone to access the Ring door camera on Brandy's house to see Davis coming into the house before Appellant left Traughber's house and went to his motel. Hospital records showed that Appellant had "[a]lcohol intoxication" and an ethanol level of 167 mg/dL when he was admitted to the hospital after the shooting, and Traughber testified that Appellant was consuming alcohol with him that night. Appellant's cell-phone records showed that in the hours prior to the shooting, Appellant repeatedly asked Brandy who was at the house, and Brandy told him it was Patrick's dad and helper looking at the house and the computer systems and venting in the house. Appellant expressed his suspicion that Brandy was lying by saying "Ya right," repeatedly asking why the man was there, and repeatedly commenting on the length of time the man had been in the house. Appellant told Brandy, "L[ast] night you said you loved me and cared about me and now this," and he called her "heartless." Appellant became angry that Brandy was not timely responding to his messages and

9

told her he was coming over, ostensibly to pick up more of his belongings. In his final message, sent at 1:53 a.m., Appellant asked Brandy, "Why is he still there[?]"

Davis testified that after he fell asleep in Brandy's bed, he woke up late at night to Appellant and Brandy arguing over their relationship in a "calm [and] collected" manner. Appellant was not screaming or yelling at the time. Appellant had a handgun and repeatedly pointed it at Brandy and Davis, telling them he was going to kill them. Appellant also explained that he was going to kill Makenzie and Cody, then himself. When Appellant saw that the police had arrived at the house, he told Brandy and Davis "It's time" and began shooting at them, striking Davis in the back and Brandy in the chest before shooting himself in the head.

On appeal, Appellant argues that he shot Brandy because of her prior abusive behavior and infidelities in the relationship and after "discovering [Brandy's] brazen infidelity in their marital bed," which constituted adequate provocation to support a finding of sudden passion. Appellant further contends that there was "no opportunity for cool reflection; [he] was so overwhelmed in that moment that his mind was incapable of cool reflection." Appellant did not testify at trial, and there is no direct evidence of his state of mind at the time of the offenses. The record only contains circumstantial evidence of that matter. Although it is understandable that Appellant would be angry upon discovering Brandy in bed at night with another man, the final message between Appellant and Brandy shows Appellant knew that a man was still at Brandy's house before he went there, suggesting his premeditation to commit the offenses. *See Naasz v. State*, 974 S.W.2d 418, 424–25 (Tex. App.—Dallas 1998, pet. ref'd) (defendant's preexisting suspicion that his wife was having an extramarital affair prior to going to her boyfriend's apartment and shooting her was evidence of his "methodical and deliberate" conduct). After arriving at the house, Appellant held Brandy and Davis at gunpoint for approximately 25 to 45 minutes before shooting them, all the

while repeatedly verbalizing his intent and plan in a calm and collected manner to kill them and Brandy's children.

As such, the jury could have found that Appellant did not simply "snap" and shoot Brandy and Davis. Instead, the evidence suggests that Appellant suspected Brandy of infidelity prior to the shooting and that even after Appellant found Brandy and Davis in bed together, he was calm while speaking to Brandy and Davis for approximately 25 to 45 minutes. Moreover, the 911 calls Cody and Makenzie made after they discovered Appellant in the house each lasted approximately seven minutes before gunshots can be heard. Thus, the record suggests that Appellant had enough time for cool reflection before he shot Brandy and Davis and that he was not overwhelmed in a moment by the emotional impact of discovering Brandy in bed with Davis. The record shows Appellant was aware of Brandy's prior infidelities and was intentional and deliberative in his words and conduct immediately prior to the shooting. This evidence supports the jury's implied findings that Appellant was still capable of cool reflection and that his actions did not arise from an adequate cause. *See* TEX. PENAL CODE ANN. § 19.02(a)(1); *see also Dudley v. State*, 992 S.W.2d 565, 568– 69 (Tex. App.—Texarkana 1999, no pet.) (evidence was legally and factually sufficient to support jury's negative sudden-passion finding where defendant shot victim "about twenty or thirty minutes" after initial confrontation, reasoning that defendant "had sufficient time to cool off").

Moreover, the evidence suggests that Appellant provoked the confrontation by traveling to Brandy's house while suspecting her of infidelity at the time. "[A] defendant may not rely on a cause of his own making, such as precipitating a confrontation, to support his argument that he acted out of sudden passion arising from adequate cause." *Gonzales*, 2019 WL 3727509, at \*2 (quoting *Smith v. State*, 355 S.W.3d 138, 149 (Tex. App.—Houston [1st Dist.] 2011, pet. ref'd)

11

(internal quotation marks omitted). The jury could have rationally concluded that because Appellant went to Brandy's house to confront her and Davis, Appellant precipitated the confrontation that ultimately led to the shooting, thus allowing the jury to reject a finding of adequate cause. *See id.*

In sum, the record contains some evidence supporting the jury's negative finding of sudden passion, and thus legally sufficient evidence supports the jury's finding. *See Ballesteros v. State*, No. 07-14-00025-CR, 2015 WL 513154, at \*2 (Tex. App.—Amarillo Feb. 5, 2015, no pet.) (mem. op., not designated for publication) (evidence was legally sufficient to support jury's negative sudden-passion finding where the evidence showed defendant and victim had a contentious relationship and defendant suspected the victim of infidelity prior to her murder).

### D. The evidence is factually sufficient to support the jury's negative sudden-passion finding

Regarding factual sufficiency, "we review all the evidence in a neutral light to determine if the contrary evidence greatly outweighs the evidence that supports the jury's determination." *Gonzales*, 2019 WL 3727509, at \*3 (citing *Matlock*, 392 S.W.3d at 671). Again, Appellant did not testify at trial and the record contains no other direct evidence of his state of mind when he shot Brandy and Davis. According to Appellant, the evidence supporting Appellant's sudden-passion claim shows Brandy had previously "toyed with [his] emotions and affections, both by flirting with [other] men in front of him and then by engaging in multiple infidelities," and continued to string Appellant along up to the day of the shooting. The evidence showed that although Appellant seemed calm when he spoke to his sister and mother the day prior to the shooting and when he was at Traughber's house the night of the shooting, Appellant became upset and irrational after he observed Brandy in bed with Davis and shot himself after shooting Brandy and Davis. This

12

evidence could support the notion that Appellant became incapable of cool reflection after he discovered Brandy in bed with Davis, which could arguably be an adequate cause giving rise to sudden passion.

But given the evidence addressed above, the jury could have rejected Appellant's contention that this event overwhelmed him with emotion and the jury could have found that Appellant's acts were purposeful and made after cool reflection instead of in sudden passion from adequate provocation. In particular, Appellant's pre-existing suspicion that Brandy was engaging in an extramarital affair with a man that night, Appellant's calm and collected demeanor when he spoke to Brandy and Davis in the bedroom immediately prior to the shooting, and the amount of time he had for cool reflection during that interaction suggest that he did not act in sudden passion when he shot Brandy and Davis. *See Ballesteros*, 2015 WL 513154, at \*2; *Dudley*, 992 S.W.2d at 568–69.

Viewing all of the evidence in a neutral light and deferring to the jury's determination of the weight and credibility of the testimony and evidence, we cannot say that the evidence against the jury's finding greatly outweighs the evidence supporting it. Neither can we say that the jury's negative finding on the sudden-passion claim is so weak as to be "manifestly unjust, conscience-shocking, or clearly biased." Thus, factually sufficient evidence supports the jury's negative finding of sudden passion. *See Matlock*, 392 S.W.3d at 671; *see also Gonzales*, 2019 WL 3727509, at \*2–3 (factually sufficient evidence supported the jury's negative finding on sudden passion where the evidence, when viewed in a neutral light, showed that the defendant's actions were "purposeful" and thus not the result of sudden passion); *Ballesteros*, 2015 WL 513154, at \*2 (factually sufficient evidence supported the jury's negative finding on sudden passion despite that defendant attempted to kill himself after committing the murder; the fact that defendant "may have

13

sought his own death after the murder or an increased punishment does not necessarily mean he did not plan to commit it"); *Dudley*, 992 S.W.2d at 568–69.

Accordingly, Appellant's sole issue is overruled.

## III. CONCLUSION

We affirm the judgment supporting Appellant's conviction.

LISA J. SOTO, Justice

May 30, 2023

Before Rodriguez, C.J., Soto, J., Marion, C.J. (Ret.)
Marion, C.J. (Ret.) (sitting by assignment)

(Do Not Publish)